**TEXAS DEPARTMENT OF CRIMINAL JUSTICE,**
Petitioner,

v.

**Brian Edward SIMONS, Respondent.**

No. 02–0479.

Supreme Court of Texas.

Argued Sept. 24, 2003.

Decided July 9, 2004.

J. Woodfin Jones, Alexander Dubose Jones & Townsend LLP, Austin, for Amicus Curiae Brian Edward Simons.

Greg Abbott, Atty. Gen. of Texas, Danica Lynn Milios, Howard G. Baldwin, First Asst. Attys. Gen., Philip A. Lionberger, Brown McCarroll, L.L.P., Michael T. McCaul, Executive Asst. Atty. Gen., Ryan D. Clinton, Julie Caruthers Parsley, Susan Mara Stith and Jay T. Kimbrough, Rafael Edward Cruz, Barry Ross McBee, Austin, for Texas Department of Criminal.

Greg White, McGregor and White, and Aubrey R. Williams, Montez Williams & Baird, P.C., Waco, for Brian Edward Simons.

Justice HECHT delivered the opinion of the Court.

In *Cathey v. Booth*, we construed section 101.101 of the Texas Tort Claims Act[1] to provide that a governmental unit is entitled to receive formal, written notice of a claim against it within six months of the incident from which the claim arises unless it has actual notice of the claim, including knowledge of its "alleged fault producing or contributing to the death, injury, or property damage".[2] The courts of appeals have differed over exactly what this knowledge of alleged fault entails, and we granted the petition for review in this case to revisit the issue. Here, the court of appeals held that petitioner's investigation of an accident provided it with the required knowledge and therefore affirmed the trial court's denial of petitioner's plea to the jurisdiction.[3]

In another case decided today, we hold that lack of notice does not deprive the trial court of subject matter jurisdiction.[4] Although the parties in this case have not raised that issue, we nevertheless conclude that because lack of notice cannot be made the basis of a plea to the jurisdiction in the trial court, the court of appeals had no jurisdiction over this interlocutory appeal and should have dismissed it. Accordingly, while we resolve the issue the parties have presented, we reverse the judgment of the court of appeals and render judgment dismissing the appeal.

## I

While incarcerated at the Terrell Unit of the Texas Department of Criminal Justice (TDCJ), Brian Simons and other inmates were assigned the work of installing a guardrail around a natural gas manifold that serviced the facility. They were digging postholes with a tractor-mounted auger driven by the tractor's power take-off (a rotating splined shaft extending from the body of the tractor and powered by the engine through the transmission, to which the drive shaft of the auger was coupled). When the auger got stuck boring into the ground, the power take-off was disengaged while Simons attempted to back the auger out of the ground by using a 48-inch pipe wrench to turn the drive shaft in reverse. By mistake, the power take-off was re-engaged with the heavy wrench still gripping the drive shaft, causing the wrench to swing around sharply, striking Simons in the head. It is not clear whether the tractor operator failed to warn Simons to stand clear of the auger, or whether Simons did not hear the warning because of a hearing impairment, or whether he was warned and simply failed to comply. He was taken to the hospital, where he underwent surgery the same day to repair multiple orbital and facial fractures and a laceration of his right eye. Simons lost the eye as well as the hearing in his right ear.

TDCJ immediately investigated the incident. Within hours it took statements from the work supervisor, Ron Canon, and three inmates who were at the scene. Canon filed this brief official report:

> On 8/30/94 while digging holes to mount guard, digger got stuck. I/M Simons, Brian 614989 and myself (Mr. Canon [SSN omitted]) used a pipe wrench to free digger and took wrench off when free. I/M put wrench back on when PTO was turned on wrench hit I/M on right cheek.

1. Tex. Civ. Prac. & Rem.Code § 101.101.

2. 900 S.W.2d 339, 341 (Tex.1995) (per curiam).

3. 74 S.W.3d 138, 142 (Tex.App.-Beaumont 2002).

4. *University of Texas Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 355, 2004 WL 1533271, *2 (Tex.2004).

His statement to the prison safety officer, Harris Jackson, expanded somewhat:

> On 8/30/94 Inmate Simons, Brian 614989 and myself (Mr. Canon) were digging holes to mount guards around the gas manifold. The post hole digger got stuck in the hole. At this time the PTO on the tractor was disengaged. I instructed the inmate to stand clear in case the post hole digger came loose so it would not hit him. After getting the digger free, inmate Simons and myself took the pipe wrench off the digger. At this time, I walked around the digger to get on the tractor. Between the time I walked around the tractor, the pipe wrench was put back on the digger. I looked back and could only see the inmate did not see the wrench. I turned the PTO on and heard wrench hit digger and inmate was on the ground. I turned tractor off and called for medical.

Canon also filed an "offense report" citing Simons for violating prison rules by failing to "stand clear of digger" as ordered.

One of the inmates working with Canon and Simons, Earl Huff, gave the following statement:

> On Tuesday, 8/30/94 at approximately 9:30 am officer Canon, myself Huff, Earl 502003, inmate Suire, Daniel TDC 631261 and inmate Thomas, Michael 591893 and inmate Simons, Brian TDC 614989 was in the process of putting a guard rail barricade around a gas line using a tractor and augur [sic] to drill holes when the drill bit become stuck in the ground. We then started to back the drill bit out by using a pipe wrench. Once the drill bit was loose enough to use the tractor Officer Canon told every one to get back. The pipe wrench had been removed from the shaft of the augur [sic] and for some reason inmate Simons re-attached the pipe wrench when Officer Canon had told everyone

to stand clear and at the same time Mr. Canon was ready to start the augur [sic] Simons reached over the augur [sic] and the pipe wrench came up and hit him in the face.

Another, Daniel Suire, was briefer:

> I Daniel Suire TDC 631261 was at the scene when the accident happened. Mr. Canon told all of us to get away. I was showing Mr. Canon the P.T.O. turn on switch. The next thing I heard was a loud pop and when I looked back inmate Simons was on the ground.

The third, Michael Thomas, was briefer still:

> Mr. Canon told us all to get back from the tractor so I went back to my usual job. Then when I turned I saw inmate Simons laying on the ground.

The next day, TDCJ took brief statements from three corrections officers who responded to the incident, but none shed any light on how it occurred. On September 1, 1994, two days after the accident, Jackson, the prison safety officer, sent the regional safety officer, Bernard Belvin, this report:

> Synopsis: Inmate Simons, Brian TDCJ# 614989 received major facial fractures right side face under eye, while working in maintenance squad digging post hole with tractor and augger [sic].
>
> Narrative: Inmate Simons, Brian TDCJ# 614989 reported to work at maintenance on 8–30–94 at approx. 6:00 am, and was assigned to work with squad digging post holes to install guard rail around main natural gas manifold that supplies unit. From approx. 6:00 am until approx. 8:00 am material and tools were gathered and loaded onto trailor [sic] for transport to the job site. While digging the northwest corner post hole, augger [sic] became stuck in hole.

A 48 inch pipe wrench was used to back augger [sic] out, in the process to free augger [sic]. Mr. Canon, Ronnie maintenance job site supervisor was assisting inmate Simons in this process. Mr. Canon then told all inmates after pipe wrench was removed from PTO drive shaft to "stand clear". Mr. Canon then walked from right side of augger [sic] around back of augger [sic] to left side of tractor and climbed onto tractor. At this time Mr. Canon looked to make sure everyone was clear, which they were. Mr. Canon then leaned over and engaged PTO. At the same time inmate Simons put the pipe wrench back on the PTO drive shaft. Pipe wrench struck inmate Simons on the right side of face under eye. Mr. Canon heard a noise and disengaged the PTO, looked up and saw inmate Simons laying on ground. Mr. Canon climbed down from tractor and assisted inmate Simons until they arrived at the unit infirmary.

Recommendations: All employees and inmates in maintenance department be made aware of this accident, and what could have been done to prevent simular [sic] accidents from happening and inmate Simons recieve discipilinary [sic] for violation of safety policy and procedures.

Corrective Action: Disciplinary [sic] case has been written by maintenance supervisor and awareness training will be held on September 6, 1994 in maintenance about this accident.

As noted, Simons was cited and disciplined for misconduct in failing to stand clear of the auger as ordered.

On September 2, three days after the incident, Jackson and Belvin audiotaped an interview with Simons at the hospital. At the time, Simons was taking Vicodin, a prescription narcotic pain-reliever. We quote the relevant portions of the interview:

JACKSON: Inmate Simons, would you give us a statement of what you remember that happened in your own words.

SIMONS: We was digging post holes for the barricade to go around the gas well. The guy that was operating the tractor was kinda inexperienced, he was kinda new at it. He buried the auger in the ground, which caused the front of the tractor to lift up. I asked Mr. Canon and them to go get me a pipe wrench 'cause—I'm a farm boy in the world— that is how you get them un-stuck in the world, and I was going to back the auger off and get it up off the ground. The boy that was operating the tractor—evidently—accidentally, he had to hit the PTO or something, and it caused the pipe wrench to hit me. That is the only way that it could have happened. If nobody—if he hadn't hit that PTO, or something like that would have happened, the wrench wouldn't have hit me—because you can back it off by hand, and turn the wrench backwards and back it off by hand. That's how we do it in the world. To me, it wasn't no boss's fault. I don't think it was my fault. I don't think it was the tractor driver's fault. I just think it is one of those things that just happened, in my opinion. You know, I don't hold no grudges against nobody. I don't blame nobody for it. It is probably just as much my fault, getting down there and doing it, than it was anybody else.

JACKSON: Okay.

SIMONS: So, it is just one of them things that—that's the only way I was taught all my life how to get them un-stuck, and that was the way I was trying to get it un-stuck, and just somebody made a mistake. That's all there was to it. I don't want nobody getting no trou-

ble or nothing behind that C losing no good time—because it's just a mistake. You know, a mistake is a mistake.

JACKSON: That is all that you remember, is backing it out? Did you take the wrench off of it when you got to backing it out?

SIMONS: I remember putting the wrench on the auger and turning it to my right to back it off, and that is the last thing I remember. The next thing I remember, I woke up and I was in the operating room. They was talking to me in the operating room. You know, between there and the time of the operating room, I had no recall of what happened.

\* \* \*

BELVIN: Do you know who engaged the PTO—who did the C engaged the PTO?

SIMONS: The tractor boy was on the tractor. I don't know whether he engaged it or not. I can't honestly say that because I can't remember if I seen anybody do it or not. I really don't know. You know, I'm just saying that because I know up here in my mind, that is the only way I could have got hit with that wrench, is somebody did engage the PTO.

\* \* \*

BELVIN: We are very sorry that happened.

SIMONS: It's like that, Boss. I don't hold nothing against nobody. It could have very well happened to somebody else.

BELVIN: We are just trying to make sure if there was a procedure that was done, in doing that, that we could bring it up and prevent it from ever happening

this way again. And I know you would want to help us do that.

SIMONS: I sure would, but I'm just saying—

BELVIN: And I'm hoping you would.

SIMONS: The point that I want to stress in it was it wasn't no boss man's fault, you know. It wasn't no inmate's fault or nothing. It's something that just happened. I had on my safety—my welding safety glasses I wear every day, you know, and, of course, they are not going to stop nothing like no pipe wrench that big. But I mean, as far as safety rules and regulations that we abide by every day, everything was abided by. I don't believe no boss did anything wrong, or supervising an inmate were any kind of way wrong. I don't believe that I did anything wrong, nor did any other inmate. It's just one of them things that happened.

BELVIN: I want to ask you one question, but think about this one. Did you hear anybody make the comment, "stand clear"?

SIMONS: I don't remember.

BELVIN: Okay, that's good.

SIMONS: I don't remember anything that was—had been said. I remember putting the wrench on there, making one, maybe two turns with the wrench the opposite way on the auger to back it off, that's it. The next thing I did, I woke up in the operating room. That's the last thing I remember.

Simons did not mention the matter again to TDCJ prior to filing suit on August 28, 1996, two days before limitations would have run.[5] Nearly five years later, on August 20, 2001, TDCJ filed a plea to the jurisdiction, arguing that because it had not received notice of Simons's claim

---

**5.** *See* Tex. Civ. Prac. & Rem.Code § 16.003(a).

within six months of the incident as required by section 101.101, its immunity from suit was not waived under the Tort Claims Act, and therefore the court lacked subject matter jurisdiction over the suit. Simons argued that section 101.101 did not require the six months notice because TDCJ already had actual notice under the statute. The trial court denied the plea, and TDCJ appealed.[6] A divided court of appeals agreed with Simons's notice argument, explaining:

> We are concerned here only with the Department's realization of its possible culpability, that is, whether the Department realized that it could be accused of negligence arising from the accident. In contrast to cases questioning whether the governmental entity's treatment records revealed its deviation from the standard of care, in this case the Department's safety officers conducted an extensive investigation of a serious injury that occurred while the inmates were operating motor-driven machinery in a supervised work detail. Reports were prepared and promptly submitted to the unit's safety committee. That notice, sufficient to put the Department on inquiry of its possible fault, is demonstrated by the existence of the safety review actually conducted.[7]

In dissent, Justice Gaultney argued that "[t]he required 'actual notice' to the governmental entity is notice of a claim of fault, not simply notice of an accident."[8] Not only did TDCJ lack the required notice before suit was filed, Justice Gaultney pointed out, "Simons affirmatively told the government he did not claim the government or anyone else was at fault."[9]

Having concluded that TDCJ had actual notice of Simons's claim, the court added that it "need not address whether the notice requirement is jurisdictional"[10] even though, as we shall explain, that issue determines whether the court of appeals had jurisdiction over this interlocutory appeal. Simons had not raised the issue either in the trial court or on appeal.

We granted TDCJ's petition for review.[11] We have jurisdiction over this interlocutory appeal because of the dissent in the court of appeals.[12] We also have jurisdiction to determine whether the court of appeals had jurisdiction.[13]

## II

Section 101.101 of the Texas Tort Claims Act states in pertinent part:

> (a) A governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred. The notice must reasonably describe:
>
> (1) the damage or injury claimed;
>
> (2) the time and place of the incident; and

---

6. *See id.* § 51.014(a)(8) ("A person may appeal from an interlocutory order of a district court ... that ... grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001 [of the Tort Claims Act]").

7. 74 S.W.3d at 142.

8. *Id.*

9. *Id.*

10. *Id.*

11. 46 Tex. Sup.Ct. J. 584 (Apr. 17, 2003).

12. Tex. Gov't Code §§ 22.001(a)(1), 22.225(c).

13. *Qwest Communications Corp. v. AT & T Corp.*, 24 S.W.3d 334, 335–336 (Tex.2000) (per curiam) ("This Court has jurisdiction to determine whether a court of appeals correctly decided its jurisdiction over an interlocutory appeal.").

(3) the incident.

* * *

(c) The notice requirement[ ] provided ... by Subsection[ ](a) ... do[es] not apply if the governmental unit has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged.[14]

We construed these provisions in *Cathey v. Booth*.[15] There, Jerry and Glenda Booth alleged that a county hospital's negligent diagnosis and treatment of Glenda's obstetric condition resulted in the stillborn delivery of their child. We stated that section 101.101(a) requires formal, written notice, which the Booths undisputedly did not give.[16] The Booths argued that such notice was excused by subsection (c) because the hospital had actual notice that injury and death had occurred, since the events of which the Booths complained all happened in the hospital and involved hospital personnel. We rejected the Booths' argument, holding that their literal reading of subsection (c) would defeat the statute's purpose. We explained:

The purpose of the notice requirement is to ensure prompt reporting of claims in order to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial. *See City of Houston v. Torres*, 621 S.W.2d 588, 591 (Tex. 1981). The interpretation of section 101.101(c) urged by the Booths would eviscerate the purpose of the statute, as it would impute actual notice to a hospital from the knowledge that a patient received treatment at its facility or died

after receiving treatment. For a hospital, such an interpretation would be the equivalent of having no notice requirement at all because the hospital would be required to investigate the standard of care provided to each and every patient that received treatment.

We hold that actual notice to a governmental unit requires knowledge of (1) a death, injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to the death, injury, or property damage; and (3) the identity of the parties involved. Our holding preserves the purpose of the notice statute, and is consistent with the holdings of the majority of the courts of appeals.[17]

The only evidence of (2) the Booths presented was the affidavit of a physician who testified that information in Glenda's medical records showed that her Cesarean section was not performed when it should have been. We held that, "as a matter of law, this information failed to adequately convey to the Hospital its possible culpability for mental and physical injuries to Glenda and Jerry Booth."[18]

Simons argues that *Cathey's* holding should apply only to hospitals and other such health care facilities which must deal with disease, injury, and death so regularly that the mere occurrence of such events is not likely to call the facility's attention to any culpability on its part. While we certainly agree that hospitals are more likely to see injury because of the very nature of their business, nothing in section 101.101 suggests that there should be one rule for

---

14. Tex. Civ. Prac. & Rem.Code § 101.101(a), (c).

15. 900 S.W.2d 339 (Tex.1995) (per curiam).

16. *Id.* at 340–341.

17. *Id.* at 341.

18. *Id.* at 342.

hospitals and a different one for other governmental units. The problems involved in identifying incidents that involve a governmental unit's fault are common to hospitals but not unique to them. In each situation section 101.101 entitles the government to knowledge of its fault, whether by notice from the claimant or through the government's own actual awareness of the facts.

The courts of appeals have interpreted *Cathey's* requirement (2) to mean very different things. One view is that "[t]o have actual notice, the governmental unit must have the same information it would have had if the claimant had complied with the formal notice requirements." [19] Certainly, when records or investigative reports give no indication that a governmental unit has been at fault in an incident, it has no actual notice.[20] A report of injury to an employee who has no duty to investigate the facts of an incident has been held not to give the employer actual notice.[21] But a hospital director's awareness of an incident and

19. *National Sports & Spirit, Inc. v. Univ. of N. Texas*, 117 S.W.3d 76, 80–81 (Tex.App.-Fort Worth 2003, no pet.) (concluding that a university had actual notice of its possible fault from a detailed investigative report by the Center for Disease Control that an E. coli outbreak was linked to poor on-campus food handling practices) (affirming dismissal of cross-claim on other grounds); *Texana Cmty. MHMR Ctr. v. Silvas*, 62 S.W.3d 317, 325 (Tex.App.-Corpus Christi 2001, no pet.) (holding that the plaintiff's statement to the defendant's employee that "someone ... had left the water on again" where she slipped and fell did not indicate how she thought the defendant was at fault) (reversing denial of plea and dismissing); *Garcia v. Tex. Dep't of Crim. Justice*, 902 S.W.2d 728, 730–731 (Tex. App.-Houston [14th Dist.] 1995, no writ) (holding that the defendant's letter expressing sympathy over the plaintiff's decedent's death did not show that the defendant had knowledge of any alleged fault or culpability) (affirming summary judgment).

20. *Texas Dep't of Transp. v. Blevins*, 101 S.W.3d 170, 172–174 (Tex.App.-Fort Worth 2003) (holding that the defendant had no actual notice of its culpability contributing to an accident in which a driver of a propane truck was killed when his truck struck a bridge abutment and overturned, when the defendant's investigator concluded that the bridge's integrity was unaffected and there was no safety risk; he also did not question witnesses or report the incident to his superiors, as would have been required if he had found potential liability) (reversing denial of plea, and dismissing), *appeal dismissed per curiam*, 140 S.W.3d 337, 2004 WL 1533055 (Tex.

2004); *Benavides v. Dallas–Fort Worth Int'l Airport Bd.*, 946 S.W.2d 576, 579 (Tex.App.-Fort Worth 1997, no writ) (holding that an airport police report of a rainy-day one-car accident on an airport service road, and the report of a similar, previous accident, did not give the airport board actual notice of any claim of its culpability in producing or contributing to the accident) (affirming summary judgment); *Gonzalez v. El Paso Hosp. Dist.*, 940 S.W.2d 793, 795–797 (Tex.App.-El Paso 1997, no writ) (concluding that following jury's refusal to find actual notice, actual notice was not established as a matter of law when one doctor testified that the plaintiff's blood poisoning did not give actual notice that his care-givers did anything wrong to cause this condition, that infection associated with using a Hickman catheter was not so unusual as to necessarily give notice that medical personnel had done something wrong in causing the infection, that notice of a post-discharge infection did not give notice of claim against doctors and nurses who cared for the patient in the hospital, and that the pseudomonas infection causing plaintiff's brain bleed could have been a recurrence of plaintiff's initial infection rather than a secondary one caused by the Hickman catheter, in that pseudomonas infection arising from such catheters is rare) (affirming judgment based on jury's refusal to find actual notice).

21. *McDonald v. State*, 936 S.W.2d 734, 737–739 (Tex.App.-Waco 1997, no writ) (holding that giving notice of an injury caused by tripping on the sidewalk to a university café cashier who had no duty to investigate did not give actual notice to the university) (directed verdict affirmed).

potential liability issues has been held to raise a factual issue regarding actual notice.[22] Some courts, like the court of appeals in this case, have stated a broader view that the occurrence of an event may itself provide actual notice if fault is obvious or an investigation is triggered:

> Actual notice may be imputed to a governmental unit when its fault is obvious or an agent charged with a duty to investigate and report to the unit receives notice of the three *Cathey* elements. Thus, an incident that triggers an investigation and accident report will impute such notice where there is evidence to connect the accident to an action or omission by the governmental unit such that it should have known of its potential culpability.[23]

Some courts have said that such an incident must be disruptive enough to call the governmental unit's attention to its fault.[24] The broadest view is that an incident itself gives actual notice if it *should* trigger an investigation that *would* or *could* show the governmental unit at fault:

> Actual notice is imputed to a governmental entity if it, or one of its agents, is aware of facts and circumstances surrounding an accident sufficient to put them on inquiry that, if pursued, would reveal its alleged or possible fault producing or contributing to the injury. Governmental entities have actual notice to the extent that a prudent entity could ascertain its potential liability stemming from an incident, either by conducting a further investigation or because of its obvious role in contributing to the inci-

**22.** *Johnson v. Nacogdoches County Hosp. Dist.*, 109 S.W.3d 532, 537 (Tex.App.-Tyler 2001, pet. denied) (holding that hospital director's affidavit stating that within a month of the decedent's death she became aware that the decedent had come to the emergency room and had not been treated, and that she was aware of the potential for liability, raised a fact question whether the hospital had actual notice) (reversing summary judgment); *Dallas–Fort Worth Int'l Airport Bd. v. Ryan*, 52 S.W.3d 426, 429 (Tex.App.-Fort Worth 2001, no pet.) (holding that legal staff's receipt of the plaintiff's letter requesting a copy of the defendant's report of her slipping on ice and breaking her knee cap, and referring to herself as "the victim", gave actual notice) (affirming denial of plea).

**23.** *Angleton Danbury Hosp. Dist. v. Chavana*, 120 S.W.3d 424, 427–428 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (citations omitted) (holding that physician's hospital report that he had given a patient the wrong injection because it was handed to him by a nurse, listing two of the hospital's nurses as the only witnesses, raised a fact question whether the hospital had actual notice of its potential culpability) (affirming denial of plea); *accord National Sports*, 117 S.W.3d at 80; *see City of Houston v. Daniels*, 66 S.W.3d 420, 424 (Tex. App.-Houston [14th Dist.] 2001, no pet.)

(holding that city may have had actual notice of fault in an automobile collision involving a police car from the investigating officer's report which contained the statement of the officer driving the car that his speed had been 60 mph just before the accident and 48 mph at the time of impact, when the posted speed limit was 35 mph) (affirming denial of summary judgment); *Brown v. City of Houston*, 8 S.W.3d 331, 332–333 (Tex.App.-Waco 1999, pet. denied) (holding that city employee's immediate investigation and detailed report of the plaintiff's injury from being hit by a bag dropped by someone above him on an escalator gave the city actual notice) (reversing dismissal).

**24.** *Crane County v. Saults*, 101 S.W.3d 764, 769 (Tex.App.-El Paso 2003, no pet.) (holding that jailers' report of an injured inmate did not provide actual notice) (reversing denial of plea and dismissing); *City of San Angelo v. Smith*, 69 S.W.3d 303, 307 (Tex.App.-Austin 2002, pet. denied) (holding that the plaintiff's fall into a tank in the presence of a plant superintendent gave actual notice when the superintendent knew the injury required hospitalization and notified the plant's risk manager, and the next day the City began construction of a guard rail and denied access to photograph the site) (affirming denial of plea).

dent.[25]

One court has expressed some criticism of the notice requirement:

> we decline to foster litigiousness by forcing injured parties to immediately retain legal counsel in order to preserve their claims in the face of hyper-technical notice provisions.[26]

By holding in *Cathey* that "actual notice to a governmental unit requires knowledge of ... the governmental unit's alleged fault producing or contributing to the death, injury, or property damage", we did not mean that the governmental unit was required to know that the claimant had actually made an allegation of fault.[27] Such knowledge would be tantamount to the notice required by section 101.101(a), only less formal, making the "actual notice" exception in subsection (c) virtually insignificant. On the other hand, *Cathey* cannot fairly be read to suggest that a governmental unit has actual notice of a claim if it could or even should have learned of its possible fault by investigating the incident. Interpreted so broadly, subsection (c) would become the rule, leaving subsection (a) as the exception for situations when the governmental unit was wholly unaware that any incident had oc-

curred at all. Governmental units would not be given notice of most incidents and would thus have some need to investigate them all, which, as we explained in *Cathey*, would defeat the purpose of the notice provision.

What we intended in *Cathey* by the second requirement for actual notice was that a governmental unit have knowledge that amounts to the same notice to which it is entitled by section 101.101(a). That includes subjective awareness of its fault, as ultimately alleged by the claimant, in producing or contributing to the claimed injury. If a governmental unit has this subjective awareness of fault, along with the other information to which it is entitled under section 101.101(a), then requiring formal, written notice in addition would do nothing to further the purpose of the statute—which is, "to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial."[28] It is not enough that a governmental unit should have investigated an incident as a prudent person would have, or that it did investigate, perhaps as part of routine safety procedures, or that it should have known from the investigation it conducted that it

---

25. *City of San Antonio v. Johnson,* 103 S.W.3d 639, 641–642 (Tex.App.-San Antonio 2003) (citations omitted) (holding that a police report stating that the plaintiff rear-ended a vehicle that had slowed behind a police car making a U-turn raised a fact question regarding actual notice) (affirming denial of plea), *pet. denied per curiam,* 140 S.W.3d 350, 2004 WL 1535643 (Tex.2004); *accord National Sports,* 117 S.W.3d at 80; *Saults,* 101 S.W.3d at 769; *Smith,* 69 S.W.3d at 307; *Gaskin v. Titus County Hosp. Dist.,* 978 S.W.2d 178, 181–183 (Tex.App.-Texarkana 1998, pet. denied) (holding that hospital records including symptoms and complaints indicative of a rectovaginal fistula raised a fact issue whether the hospital had actual notice of its failure to treat the plaintiff, though not of any culpability in causing the fistula) (re-

versing summary judgment in part); *Reynosa v. Bexar County Hosp. Dist.,* 943 S.W.2d 74, 76, 77–79 (Tex.App.-San Antonio 1997, writ denied) (holding that while a hospital district may have actual notice of its fault if it should have known from its records that its negligence probably caused the plaintiff's injury, the records here did not communicate culpability and no expert testimony causally connected the conduct shown in the records to a newborn's brain injury) (affirming summary judgment for that defendant).

26. *Ryan,* 52 S.W.3d at 429.

27. *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex. 1995) (per curiam).

28. *Id.* at 341.

might have been at fault. If a governmental unit is not subjectively aware of its fault, it does not have the same incentive to gather information that the statute is designed to provide, even when it would not be unreasonable to believe that the governmental unit was at fault.

We recognize that the Legislature may determine the conditions for waiving sovereign immunity from suit, and that it could make formal notice an absolute requirement, if for no other reason than to achieve a measure of certainty in the matter. But it has not done so in section 101.101. The "actual notice" exception in subsection (c), as we read it, makes determining compliance with section 101.101 somewhat less certain. We have long held that actual notice is a fact question when the evidence is disputed.[29] In many instances, however, actual notice can be determined as a matter of law. There will, of course, be times when subjective awareness must be proved, if at all, by circumstantial evidence.[30] But this is not inconsistent with the purpose of section 101.101.

TDCJ argues that if by investigating an incident a governmental unit can open itself to suit, it will have a perverse incentive to ignore every incident until it receives formal notice of a claim. We think this argument is largely unfounded. Any

incentive not to investigate so as to avoid liability is slight, since a governmental unit cannot acquire actual notice merely by conducting an investigation, or even by obtaining information that would reasonably suggest its culpability. The governmental unit must have actual, subjective awareness of its fault in the matter. Moreover, the risk of losing important information through delay may be a significant incentive to conduct an investigation.

■ It is not, of course, for us to determine whether section 101.101 is good policy, as one court has questioned.[31] That issue is for the Legislature. Our responsibility is to construe and apply the provision as the Legislature intended. For the reasons we have given, we hold that actual notice under section 101.101(c) requires that a governmental unit have knowledge of the information it is entitled to be given under section 101.101(a) and a subjective awareness that its fault produced or contributed to the claimed injury.

## III

■ We need not determine whether TDCJ established that it lacked actual notice of Simons's claim. As it happens, we decide today in another case[32] that a claimant's failure to comply with section 101.101 does not deprive the trial court of

29. *Alvarado v. City of Lubbock,* 685 S.W.2d 646, 649 (Tex.1985); *Lorig v. City of Mission,* 629 S.W.2d 699, 701 (Tex.1982).

30. *See, e.g., Louisiana–Pac. Corp. v. Andrade,* 19 S.W.3d 245, 247 (Tex.1999) ("A plaintiff may establish the defendant's mental state by circumstantial evidence.").

31. *Martinez v. Val Verde County Hosp. Dist.,* 110 S.W.3d 480, 485–486 (Tex.App.-San Antonio 2003) ("Although we . . . believe the result is unfair, we must note that appellants' cause of action exists solely by virtue of the TTCA [Texas Tort Claims Act], which waives sovereign immunity under certain circumstances;

but for the statute, the doctrine of sovereign immunity would have prohibited this suit. Being bound by the procedural devices in the statute, appellants must strictly comply with the notice provision. Despite the effect on appellants' special situation, we have no alternative but to defer to the legislature for any statutory changes . . . ." (bracket in original)) (quoting *Streetman v. Univ. of Texas Health Sci. Ctr.,* 952 S.W.2d 53, 55 (Tex.App.-San Antonio 1997, writ denied)), *aff'd,* 110 S.W.3d 480, 485 (Tex.2003).

32. *University of Texas Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 2004 WL 1533271 (Tex.2004).

subject matter jurisdiction. While compliance is no less mandatory, and a governmental unit is entitled to dismissal of the action for lack of notice, that right cannot properly be asserted in a plea to the jurisdiction from which an interlocutory appeal is allowed. Section 51.014(a)(8) allows an appeal from an interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit".[33] The reference to "plea to the jurisdiction" is not to a particular procedural vehicle but to the substance of the issue raised. Thus, an interlocutory appeal may be taken from a refusal to dismiss for want of jurisdiction whether the jurisdictional argument is presented by plea to the jurisdiction or some other vehicle, such as a motion for summary judgment.[34] By the same token, an interlocutory appeal cannot be taken from the denial of a plea to the jurisdiction that does not raise an issue that can be jurisdictional. Otherwise, a governmental unit could cloak its request for protection from discovery in the procedural guise of a plea to the jurisdiction and when it was denied, appeal. Since notice under section 101.101 is not jurisdictional,[35] an interlocutory appeal from the denial of a plea to the jurisdiction based on lack of such notice is not allowed.

It is important to note that the same result would not obtain if the issue raised *could* defeat the court's subject matter jurisdiction, even if it did not do so in a particular case. For example, a governmental unit can appeal from an order denying a plea to the jurisdiction based on the assertion that the plaintiff's claim does not involve the use of personal property under section 101.021 of the Tort Claims Act.[36] If the court of appeals agrees with the trial court that the use of personal property is involved, it should affirm the order rather than dismiss the appeal. Only when the issue raised cannot implicate subject matter jurisdiction must the interlocutory appeal be dismissed.

The court of appeals mistakenly believed that it was unnecessary to determine whether section 101.101 notice is jurisdictional. It can surely be forgiven the error when Simons did not raise the issue, either in his response to TDCJ's plea to the jurisdiction in the trial court, or at any time in the court of appeals. Indeed, Simons has not raised the issue before this Court. Nevertheless, we are constrained, for reasons we have explained more fully elsewhere today,[37] to render the judgment the court of appeals should have rendered, which is to dismiss the appeal.

\* \* \* \* \* \*

Accordingly, the judgment of the court of appeals is reversed and the appeal is dismissed.

---

**33.** Tex. Civ. Prac. & Rem.Code § 51.014(a)(8).

**34.** *Harris County v. Sykes,* 136 S.W.3d 635, 638 (Tex.2004); *San Antonio State Hosp. v. Cowan,* 128 S.W.3d 244, 245 n. 3 (Tex.2004).

**35.** *Loutzenhiser,* 140 S.W.3d at 358.

**36.** *See* Tex. Civ. Prac. & Rem.Code § 101.021.

**37.** *See Loutzenhiser,* 140 S.W.3d at 359.