IN THE SUPREME COURT OF TEXAS
 
════════════
No. 08-0215
════════════
 
 
University of Texas 
Southwestern Medical Center
at Dallas, 
Petitioner,
 
v.
 
The Estate of Irene Esther 
Arancibia by its Beneficiary
Victor Hugo Vasquez-Arancibia, Victor Hugo Vasquez-Arancibia, Individually, and Cecilia Vasquez-Arancibia,
Individually, 
Respondents
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Fifth District of Texas
════════════════════════════════════════════════════
 
Argued September 10, 2009
 
 
            
Justice Johnson, joined by 
Justice Wainwright, 
dissenting.
 
            
I agree that the Tort Claims Act’s prerequisites to suit are 
jurisdictional as to the Arancibias’ claim. And 
because the Arancibias did not give timely formal 
notice of their claim as required by the Tort Claims Act, U. T. Southwestern’s immunity from suit was waived only if it had 
actual notice of the Arancibias’ claim as the term 
“actual notice” is used in the Tort Claims Act. In order for Southwestern to 
have had actual notice, it had to have timely, subjective knowledge that it was 
at fault in causing Irene Arancibia’s death. See 
Tex. Dep’t of Criminal Justice v. Simons, 140 S.W.3d 
338, 348 (Tex. 2004). The basis for the Arancibias’ claim that Southwestern was at fault is that the 
surgeons who first operated on Irene negligently caused her death by breaching 
the applicable standard of care. The Court does not identify evidence that 
Southwestern knew the injuries to Irene were caused by breach of a standard of 
care and that it therefore had actual subjective awareness it was at fault in 
causing Irene’s death. Thus, I disagree with the Court’s conclusion that 
Southwestern had timely, actual notice of the Arancibias’ claim within the meaning of the Tort Claims 
Act.
I.
            
The Arancibia family did not give notice of 
claim to Southwestern, Parkland Hospital, where the surgery was performed, or 
any of the doctors who performed the first surgery until over seven months after 
Irene’s death. By a letter dated May 7, 2004, they notified Dr. Mark Watson, who 
had supervised Irene’s surgery, that the family 
intended to pursue legal action. On August 3, 2004, Irene’s son and daughter 
filed suit against Dr. Watson and the doctors who had performed the surgery, 
Drs. Curtis and Yau, individually. They alleged that 
in several ways the doctors breached applicable standards of care and the 
breaches caused Irene’s death. On January 28, 2005, the Arancibias amended their pleadings. They added Southwestern 
and Dallas County Hospital District d/b/a Parkland Hospital (collectively, the 
entities) as defendants and dismissed the doctors. The entities pled lack of 
notice under the Tort Claims Act and sought dismissal on the basis of sovereign 
immunity.
            
The trial court denied the entities’ jurisdictional pleas and the court 
of appeals affirmed. 244 S.W.3d 455, 460.
            
Only Southwestern filed a petition for review. It asserts, in part, that 
sovereign immunity bars the Arancibias’ claims because 
section 311.034 makes prerequisites to suit jurisdictional, see Tex. Gov’t Code § 311.034, the Arancibias admittedly failed to give timely notice of claim 
under section 101.101(a), see Tex. Civ. Prac. & Rem. Code § 
101.101(a), and Southwestern did not have actual notice of the claim pursuant to 
section 101.101(c). See id. § 101.101(c). In response, the Arancibias urge that formal notice to Southwestern was not 
required because they first sued the doctors individually as opposed to the 
entities, and reading the Tort Claims Act to require pre-suit notice to 
Southwestern under such circumstances would yield an absurd result. They also 
claim that Southwestern had actual notice of their claim so formal notice under 
section 101.101(a) was not required.
II.
            
Section 101.101(a) of the Tort Claims Act establishes the general rule 
that timely notice of a claim must be given to a governmental entity as a 
prerequisite to suit against that entity:
 
A governmental unit is entitled to receive notice of a 
claim against it under this chapter not later than six months after the day that 
the incident giving rise to the claim occurred. The 
notice must reasonably describe:
                                    
(1) the damage or injury claimed;
                                    
(2) the time and place of the incident; 
and
                                    
(3) the incident.
 
Tex. Civ. 
Prac. & Rem. Code § 
101.101(a). As the Court notes, the purpose of 
the notice requirement “is to ensure prompt reporting of claims in order to 
enable governmental units to gather information necessary to guard against 
unfounded claims, settle claims, and prepare for trial.” Cathey v. Booth, 900 S.W.2d 339, 341 (Tex. 
1995) (citing City of Houston v. Torres, 621 S.W.2d 588, 591 (Tex. 
1981)).
            
Even absent the formal notice of claim required by section 101.101(a), 
however, section 101.101(c) waives a governmental entity’s immunity if the 
entity “has actual notice that death has occurred, that the claimant has 
received some injury, or that the claimant’s property has been damaged.” Tex. Civ. Prac. & Rem. 
Code § 101.101(c). In 
Cathey, the Court held that to have actual 
notice under section 101.101(c), the governmental unit must have “knowledge of 
(1) a death, injury, or property damage; (2) the governmental unit’s alleged 
fault producing or contributing to the death, injury, or property damage; and 
(3) the identity of the parties involved.” Id. at 
341.
            
The Court clarified the second element of this standard—the governmental 
unit’s alleged fault producing or contributing to the death, injury, or property 
damage—in Simons, a case strikingly similar to the case before us in 
regard to whether the governmental entity had actual notice of its fault. 
See 140 S.W.3d 338. In Simons, a work 
crew from the Terrell Unit of the Texas Department of Criminal Justice was 
digging postholes using an auger attached to a power take-off (PTO) mounted on 
the rear of a tractor. The auger became stuck in the ground, so the PTO was 
disengaged and a pipe wrench was attached to the auger in an attempt to back the 
auger out of the ground by hand. The TDCJ work supervisor, Ron Canon, left the 
area of the auger, went to the tractor and re-engaged the PTO. Simons was struck 
in the head and severely injured when the auger rotated and the pipe wrench 
swung around.
            
TDCJ immediately investigated and took statements from Canon and all the 
work crew. The statements and the report of the accident submitted by the prison 
safety officer indicated that when Canon went back to the tractor to re-engage 
the PTO, the pipe wrench had been taken off the auger, the workers had been told 
to stand clear of the auger, and Canon looked back before he engaged the auger 
and could see Simons but could not see that the pipe wrench, instead of being 
off the auger, was on the auger. Id. at 
339-41.
            
Three days after the accident, the prison safety officer and the TDCJ 
regional safety officer took a statement from Simons who was in the hospital and 
on a prescription pain reliever. Simons opined that the person operating the 
tractor was “kinda new.” Simons remembered putting the 
pipe wrench on the auger and making one or two turns to back the auger out, and 
he did not remember hearing anyone say “stand clear.” He also opined that he did 
not blame anyone for his injury, he did not want anyone to get in trouble or 
lose good time over it, it was a mistake and “a mistake is a mistake.” 140 S.W.3d at 339-42. Thus, there was an unquestioned, 
unintended injury that resulted from a TDCJ employee’s intentional act of 
re-engaging the PTO while a pipe wrench was attached to the auger, the wrench 
was out of the employee’s field of view, and the injured person attributed the 
injury to a “mistake” without directing blame toward anyone specific.
            
The court of appeals held that TDCJ had actual notice under the Tort 
Claims Act. Tex. Dep’t of Criminal Justice v. Simons, 74 S.W.3d 138, 142 
(Tex. App.—Beaumont 2002), rev’d, 140 S.W.3d 
338 (Tex. 2004). In reaching its conclusion, it noted that there was an 
unquestioned injury, a TDCJ employee had re-engaged the PTO that resulted in the 
injury, and an investigation was accomplished that put TDCJ on inquiry of its 
possible fault:
 
To support its argument that its records do not raise a 
fact issue on notice of culpability, the Department relies upon the conclusion 
it reached after it completed its investigation of the incident. We are 
concerned here only with the Department’s realization of its possible 
culpability, that is, whether the Department realized that it could be accused 
of negligence arising from the accident. . . . [T]he Department’s safety 
officers conducted an extensive investigation of a serious injury that occurred 
while the inmates were operating motor-driven machinery in a supervised work 
detail. Reports were prepared and promptly submitted to the unit’s safety 
committee. That notice, sufficient to put the Department on inquiry of its 
possible fault, is demonstrated by the existence of the safety review actually 
conducted. The Department did investigate the accident and gather the 
information it needed to defend Simons’s 
claim.
 
Id. This Court disagreed and 
explained:
 
What we intended in Cathey by the second requirement for actual notice 
was that a governmental unit have knowledge that 
amounts to the same notice to which it is entitled by section 101.101(a). That 
includes subjective awareness of its fault, as ultimately alleged by the 
claimant, in producing or contributing to the claimed injury. If a 
governmental unit has this subjective awareness of fault, along with the other 
information to which it is entitled under section 101.101(a), then requiring 
formal, written notice in addition would do nothing to further the purpose of 
the statute—which is, “to enable governmental units to gather information 
necessary to guard against unfounded claims, settle claims, and prepare for 
trial.” It is not enough that a governmental unit should have investigated an 
incident as a prudent person would have, or that it did investigate, perhaps 
as part of routine safety procedures, or that it should have known from the 
investigation it conducted that it might have been at fault. If a 
governmental unit is not subjectively aware of its fault, it does not have the 
same incentive to gather information that the statute is designed to provide, 
even when it would not be unreasonable to believe that the governmental unit was 
at fault.
 
Simons, 140 S.W.3d at 347-48 (emphasis 
added).
            
Proof of a defendant’s fault in a health care liability claim does not 
depend on proof of ordinary negligence, such as failing to assure that no one 
would be injured by the auger or an attached pipe wrench when a PTO on a tractor 
was engaged, but is rather dependant on proof that the defendant breached an 
applicable standard of care. See Tex. Civ. Prac. & Rem. Code § 
74.351 (requiring timely service of a report providing an expert’s opinion 
regarding applicable standards of care, the manner in which the care rendered by 
the physician or health care provider failed to meet the standards, and the 
causal relationship between that failure and the injury, harm, or damages 
claimed); Murphy v. Russell, 167 S.W.3d 835, 838 (Tex. 2005). Then, if 
breach of a standard of care is shown and it is also proved that the breach 
proximately caused the injury, the defendant may be found liable for damages. 
E.g., Hart v. Van Zandt, 399 S.W.2d 791, 792 (Tex. 1965) (noting 
that it is not enough in a medical negligence case to show an injury and that 
the injury might have occurred because of a doctor’s negligence). In this case, 
the Arancibias allege that the surgeons who first 
operated on Irene were at fault because they breached standards of care. They 
also allege, of course, that the breaches caused her death and Southwestern is 
liable for the surgeons’ fault or negligence.
III.
A.
            
The Arancibias first claim that they were not 
required to give notice of claim to Southwestern at all 
because they first sued the doctors individually. I disagree.
            
Under section 101.106 of the Tort Claims Act, plaintiffs must elect to 
sue either government employees or their employers. Tex. Civ. Prac. & Rem. 
Code § 101.106. The Arancibias 
assert that the notice requirements of section 101.101 do not apply to suits 
against employees sued individually and because they first sued the doctors 
individually, interpreting the Tort Claims Act to require notice to the doctors’ 
governmental-entity employers is unreasonable and absurd. They argue that 
plaintiffs will not generally give notice when they sue government employees 
individually because they are not required to. Thus, as will generally be the 
case, if notice has not been given to the entity, then requiring the 
governmental entity to be substituted for the employee is unfair and requires a 
futile action because the entity will do what Southwestern has done here and 
assert its lack of notice. The Arancibias, however, do 
not point to any language in the Tort Claims Act that indicates the Legislature 
intended section 101.106 to dispense with the notice requirements of section 
101.101.
            
In responding, Southwestern makes four arguments: (1) section 101.101(a) 
specifies that it applies to any claim against a governmental entity “under this 
chapter,” and the clear statutory language contains no exceptions; (2) the 
Legislature did not intend to allow plaintiffs to grant themselves an exemption 
from the notice requirement by suing employees first, and to do so makes no 
sense because regardless of when the governmental entity is sued it still needs 
notice, so it can investigate the claim; (3) the Arancibias’ interpretation would eviscerate the notice 
requirements of section 101.101 because a plaintiff who failed to give notice 
could initially sue an individual employee, wait for the inevitable motion to 
dismiss the employee pursuant to section 101.106(f) and then sue the employer; 
and (4) it is not unfair, as the Arancibias claim, to 
require all claimants to give notice pursuant to section 101.101(a)—the notice 
requirement is clearly stated and compliance is simple and 
inexpensive.
            
I agree with Southwestern. There is no language in the Tort Claims Act 
indicating the Legislature intended section 101.106 to allow persons to sue 
governmental entities without giving statutory notice. Regardless of the Arancibias’ concerns, construing the Tort Claims Act’s 
language as they urge would, for all practical purposes, negate the notice 
requirements of section 101.101(a). Plaintiffs who failed to give notice of 
claim as required could sue a governmental employee individually, wait for the 
employee to move for dismissal, and then sue the employer, thereby avoiding the 
notice requirements. Thus, I would hold that regardless of the fact that the 
Arancibias first filed suit against the doctors 
individually, the Arancibias must still have satisfied 
the notice prerequisites of section 101.101 in order to maintain their suit 
against Southwestern.
B.
            
As to actual notice, the Arancibias urge that 
Dr. Watson’s e-mails to his supervisor and the subsequent investigation prove, 
or at least create a fact question about, whether Southwestern had subjective 
knowledge of its fault. They also rely on testimony by Victor Arancibia that one of the surgeons who performed the 
corrective surgery after Irene returned to the hospital told Victor “somebody 
did something very wrong” during the first surgery and Victor should get a 
lawyer. Southwestern argues this evidence does not raise a fact question 
regarding whether Southwestern subjectively knew that breach of a standard of 
care, as ultimately claimed by the Arancibias, caused 
Irene’s death.
            
First, Victor Arancibia’s testimony that 
following the second (corrective) surgery, one of the surgeons told Victor that 
he should find a lawyer because someone had done something wrong during the 
first surgery is not evidence that Southwestern had subjective knowledge it was 
at fault in causing Irene’s death. Victor did not identify the surgeon who made 
the statement and there is no evidence the surgeon was an employee of 
Southwestern or that the surgeon’s opinion should be imputed to Southwestern. 
Further, whether “in the first operation somebody did something very wrong” is 
not the issue. Everyone agrees that the colon perforations were an unintended 
and undesirable result. The issue is whether Southwestern had subjective 
knowledge that the surgeons breached a standard of care appropriate to the 
laparoscopic surgery. That issue was not addressed by the statement Victor 
attributed to the unknown surgeon.
            
As for the actions of the doctors, immediately after Irene’s death Dr. 
Watson e-mailed his supervisor, Dr. Edward Livingston, Chief of the 
Gastrointestinal Endocrine Surgery Division at Southwestern, and Dr. Robert 
Rege, Chair of both the Department of Surgery at 
Southwestern and the Division of Surgery at Parkland Hospital, about the 
situation. Dr. Watson described Irene’s death as a terrible outcome, noted that 
he had “scrubbed the entire procedure,” thought it went well, and advised Drs. 
Livingston and Rege that he had already spoken with 
risk management.
            
Parkland has a possible three-step review process that takes place when 
an unexpected patient care occurrence is identified. The first step is initial 
screening by the hospital’s quality management team. The second is referral to a 
physician or monitoring committee if certain criteria are identified in the 
screening process. The third step is review by a Division Peer Review Committee 
if the second-step physician reviewer or monitoring committee so 
recommends.
            
Dr. Livingston was assigned to review the surgery as part of Parkland’s 
quality control process.[1] His review was the second of the 
three-step process. The documents used by Dr. Livingston in making his report 
were preprinted with specific questions about most aspects of the patient’s 
care. He answered in one instance that “[c]linical 
management contributed to” Irene’s death and explained his answer by a narrative 
that “a technical error occurred during the original hernia operation resulting 
in a through-and-through small bowel injury.” In regard to questions as to 
medical management, he checked the “No” box in response to “Criteria 1 = 
Practice [was] consistent with established standards. Physician Reviewer 
comfortable with practice. Practice Acceptable.” 
However, he checked the “Yes” box in regard to “Criteria 2 = Reviewed 
practice not necessarily consistent with established standards, but still 
acceptable. Physician Reviewer comfortable with practice. Practice Acceptable.” He checked additional boxes to indicate 
that the reviewed practice did not deviate or deviate significantly from 
established standards or that the practice was unacceptable. He included a 
narrative statement of his findings/conclusions in which he said that the 
unfortunate occurrence was a recognized complication of laparoscopic hernia 
surgery and no standard of care issues were identified. He did not recommend 
further review of the case. See Roark v. Allen, 633 S.W.2d 804, 811 (Tex. 
1982) (holding there was no evidence that a doctor’s negligence proximately 
caused the injury when forceps slipped during delivery and a baby’s skull was 
fractured).
            
In regard to Dr. Watson’s e-mail statement that he had contacted risk 
management about Irene’s death, evidence that an employee or agent contacted an 
enterprise’s risk management department is not evidence that the employee or 
anyone else subjectively believed the enterprise was at fault. Most entities of 
any significant size have risk management departments and require accidents or 
unusual incidents to be reported to the risk management team. The reporting 
requirement generally exists regardless of who, if 
anyone, is suspected of being at fault in causing the accident or 
incident.
            
The Arancibias point to the fact that Dr. 
Watson contacted risk management, but the record does not contain evidence 
explaining why he made the contact or what he reported to risk management. For 
example, there is no evidence of whether (1) Dr. Watson contacted risk 
management pursuant to routine protocol because a death was involved or because 
of the unexpected patient outcome, (2) his contact was not routine but was out 
of an abundance of caution, or (3) his contact was because he subjectively 
believed a breach of appropriate standards of care caused Irene’s death. 
Although Dr. Watson could not recall what he told risk management, the evidence 
is undisputed that he reported to Drs. Rege and 
Livingston that he believed the surgery went well and that the perforations 
could have been retraction injuries that occurred out of the field of view of 
the surgeons. Absent evidence of the reason Dr. Watson contacted risk management 
or what he reported, the fact the contact took place does not raise an inference 
that he believed Irene’s death was due to a breach of applicable standards of 
care as alleged by the Arancibias any more than it 
raises an inference that the contact was the product of routine protocol or some 
other reason. Cf. Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001) 
(Phillips, C.J., concurring in part and dissenting in part) (noting that the 
equal inference rule is a species of the no-evidence rule that “when the 
circumstantial evidence is so slight that any plausible inference is purely a 
guess, it is in legal effect no evidence”). For the same foregoing reasons, the 
fact that Dr. Watson reported his contact with risk management to Drs. 
Livingston and Rege, without more, does not support an 
inference that any of the doctors subjectively believed Irene’s death was due to 
a breach of applicable standards of care.
            
Next to be considered are Dr. Livingston’s investigation and report. The 
evidence shows that when a patient dies, Parkland’s standard procedure is to 
have the case reviewed for quality management purposes. There is no evidence Dr. 
Livingston’s review was other than pursuant to standard procedures. His report 
contains language that, considered in isolation or out of context, might support 
an inference that he developed a subjective belief the surgeons may have been at 
fault. For example, he indicated “[c]linical 
management contributed to” Irene’s death, “a technical error occurred during the 
original hernia operation resulting in a through-and-through small bowel 
injury,” and checked the “No” box in response to “Criteria 1 = Practice 
consistent with established standards. Physician Reviewer comfortable 
with practice. Practice Acceptable.” But in considering 
all the evidence, as we must, Dr. Livingston’s explanatory statement giving his 
opinions and conclusions cannot be disregarded. See City of 
Keller v. Wilson, 168 S.W.3d 802, 824-25 (Tex. 2005). He checked 
boxes specifically indicating Irene’s death was not the result of a breach of 
standards of care and in a narrative statement on the form he clearly set out 
his opinion that the unfortunate occurrence was a recognized complication of 
laparoscopic hernia surgery and “no standard of care issues were identified.” 
See Roark, 633 S.W.2d at 811. He recommended 
that no further review be taken, and none was. The third step in Parkland’s 
quality management follow-up process was not initiated and there is no evidence 
that further investigation of any nature was made.
            
The Court recently considered the actual notice issue in a non-health 
care setting in City of Dallas v. Carbajal, ___ 
S.W.3d ___ (Tex. 2010). There, the plaintiff sued for injuries she suffered when 
she drove into a gap in the roadway in a construction area. A City of Dallas 
police officer promptly investigated the accident. The officer’s written report 
indicated that the plaintiff drove through an unbarricaded area. The plaintiff sued over a year after the 
accident, but she had not given timely formal notice of claim to the City. The 
trial court denied the City’s plea to the jurisdiction based on lack of timely 
notice under the Tort Claims Act and the court of appeals affirmed. The court of 
appeals’ opinion turned on the City’s immediate notice that an incident had 
occurred, the lack of evidence of a responsible entity other than the City, and 
the City’s knowledge of its possible fault in the matter:
 
[T]he police report here shows the City had immediate 
notice of the incident and its possible fault in failing to block the 
gap in the road properly with barricades. . . . [T]here is no evidence here of a 
responsible entity other than the City, and the police officer making the report 
is an employee of that entity. . . . [T]he police report here is more than just 
notice of an accident or a description of a road condition; it is the police 
officer’s report of her perception of the cause of the 
accident.
 
City of Dallas v. Carbajal, 278 S.W.3d 802, 806 (Tex. 
App.—Dallas 2009), rev’d, ___ S.W.3d ___ (Tex. 
2010) (emphasis added). The Court reversed the court of appeals’ judgment. In 
doing so, the Court quoted and emphasized some of the previously-quoted language 
from Simons:
 
“It is not enough that a governmental unit should have 
investigated an incident . . . , or that it did investigate, perhaps as 
part of routine safety procedures, or that it should have known from the 
investigation it conducted that it might have been at fault. If a governmental 
unit is not subjectively aware of its fault, it does not have the same incentive 
to gather information that the statute is designed to provide, even when it 
would not be unreasonable to believe that the governmental unit was at 
fault.”
 
Carbajal, ___ S.W.3d at ___ 
(quoting Simons, 140 S.W.3d at 347-48). The Court concluded that “[w]hen a 
police report does not indicate that the governmental unit was at fault, the 
governmental unit has little, if any, incentive to investigate its potential 
liability because it is unaware that liability is even at issue.” Id. at ___. That same reasoning should apply to the 
Arancibias’ claim.
            
Dr. Livingston was designated to investigate the care Irene received and 
determine whether breaches of applicable standards of care occurred as part of 
routine procedures. His report shows that he recognized the perforations in 
Irene’s bowel were technical errors, yet it also shows his opinion was that the 
perforations were a recognized complication of the surgery Irene underwent and 
were not outside the boundaries of accepted standards of care. He made an 
unambiguous hand-written summary statement to that effect and recommended that 
no further review of the matter take place. Dr. Livingston explained his 
reasoning in his deposition and maintained that his report correctly set out his 
subjective opinion that there were no standard of care violations. Based on Dr. 
Livingston’s recommendation, the third step of Parkland’s quality management 
review process did not occur. And there is no evidence that before the Arancibias finally sent their letter notice to Dr. Watson 
more than seven months after Irene’s death, Southwestern believed it should take 
action to gather information “necessary to guard against unfounded claims, 
settle claims, and prepare for trial.” See Cathey, 900 S.W.2d at 
341.
            
The Court’s holding today does not take into account the nature of 
determining “fault” in health care cases. All the physicians recognized that the 
unrepaired perforations and Irene’s death were bad results. But although there 
is always possible, or potential, liability for a bad health care result, a bad 
result simply is not evidence that a health care provider was at fault because 
standards of care were breached. The Arancibias 
dispute Dr. Livingston’s opinion, but they do not point to any reason for 
Southwestern to have subjectively disbelieved the sincerity of his findings and 
conclusions. Nor do they refer to evidence that Southwestern or any of its 
physicians discounted Dr. Livingston’s investigation and opinion or otherwise 
independently formed a subjective belief that the surgeons caused the 
perforations by breaching any standards of care. Thus, there is no evidence that 
Drs. Watson, Livingston, Rege, or Southwestern had 
subjective knowledge or belief that the surgeons and Southwestern were at fault 
in regard to Irene’s death—and until today such knowledge has been required for 
actual notice when a litigant fails to give timely formal notice of 
claim.
            
In Simons, the Court stated that “a governmental unit cannot 
acquire actual notice merely by conducting an investigation, or even by 
obtaining information that would reasonably suggest its culpability. The 
governmental unit must have actual, subjective awareness of its fault in the 
matter.” 140 S.W.3d at 348. And in Carbajal, the Court rejected the argument that 
immediate knowledge of the facts by the City of Dallas together with the absence 
of evidence of other responsible parties and its knowledge of possible fault 
because of missing barricades was actual notice. ___ 
S.W.3d at ___. The Court should likewise reject the argument that 
Southwestern had actual notice because it knew of injuries and knew of 
undetected and uncorrected technical errors that potentially could generate 
allegations that the injuries were caused by breaches of standards of 
care.
IV.
            
I agree that statutory notice is jurisdictional under the Tort Claims Act 
as it applies to this case. I would hold that the notice issue is dispositive: 
Southwestern did not have actual notice, thus the Arancibias were required to, but did not, give timely formal 
notice. I would reverse the judgment of the court of appeals and dismiss the 
Arancibias’ suit against Southwestern for lack of 
jurisdiction.
 
 
                                                                        
________________________________________
                                                                        
Phil Johnson
                                                                        
Justice
 
OPINION DELIVERED: October 22, 2010











[1] The 
parties stipulated that Dr. Livingston’s investigation and findings could be 
considered for the purpose of determining if Southwestern had actual notice of 
the Arancibias’ 
claim.