Opinion issued April 19, 2007

















In The

Court of Appeals

For The

First District of Texas






NO. 01-04-01084-CV






THE TEXAS DEPARTMENT OF

CRIMINAL JUSTICE AND GLENDA PIERSON, Appellants


V.


LINDA THOMAS AS PERSONAL REPRESENTATIVE FOR THE
ESTATE OF DAMON HOLLIMON, DECEASED, AND

ASHLEY DOMINIQUE HOLLIMON, Appellees






On Appeal from the 278th District Court

Walker County, Texas

Trial Court Cause No. 20,377-C






DISSENTING OPINION

 This is a case brought by the estate and survivors of a young, strong, healthy,
but mentally disturbed prison inmate, Damon Hollimon. When Hollimon, a paranoid
schizophrenic, became agitated and violent, a five-man team of correctional officers
of the Texas Department of Criminal Justice (TDCJ) assigned to transfer him to a
psychiatric unit subdued him in his cell by repeatedly spraying him with O.C. pepper
spray and, when that proved insufficient, throwing him face down on the floor, where
four security personnel suited in protective gear secured his hands and feet, while
another member of the team knelt on his neck until it broke. Hollimon's heart
stopped, he quit breathing, and his eyes dilated and fixed. 

 The nurse assigned to approve the use of chemical restraint and to be on hand
to provide medical assistance during the forced move, Glenda Pierson (Pierson), did
nothing other than approve the use of the O.C. pepper spray, don a gas mask, record
the events, and, after Hollimon was removed from his cell, take Hollimon's vital signs 
and discover that there were none. Pierson then continued to stand by and do
nothing, other than to order that Hollimon be taken to the infirmary, for seven
minutes while prison employees transported Hollimon, including a five minute delay
to fetch a key to unlock an unattended locked wing picket gate between the cell block
and the prison medical department. Pierson testified that she knew Hollimon needed
cardiopulmonary resuscitation (CPR) as soon as he was taken out of his cell, but she
did not give him mouth-to-mouth resuscitation because she would have had to
remove her gas mask and the pepper spray would have disabled her. She
subsequently did remove her mask, but she still did not attempt to give Hollimon
CPR. CPR was attempted by medical personnel when Hollimon was taken into the
infirmary, but Hollimon did not respond and was pronounced dead.

 The majority holds that Appellee's suit against Appellants, TDCJ and Pierson,
must be dismissed because TDCJ had no notice of Linda Thomas's claim and Pierson
proved as a matter of law that she was not "deliberately indifferent" to the risk to
Hollimon from failure to receive CPR and is thus entitled to official immunity from
liability for the harm he sustained from not receiving CPR in time to save his life. In
my view, the majority makes serious mistakes of law in deciding both issues. If its
opinion is correct, the burden of proof of notice is so high and the standard of proof
of official immunity so low that it would be surprising if a suit could be maintained
against any Texas state agency or Texas state employee under the Texas Tort Claims
Act, the Texas Wrongful Death and Survival statutes, or section 1983 of the United
States Code ever again, making the applicable statutes otiose. Therefore, I dissent. 

 I would affirm the trial court's denial of TDCJ's plea to the jurisdiction and
Pierson's motion for summary judgment on her qualified immunity affirmative
defense.

TDCJ's Appeal

 Notice

 The majority holds that TDCJ did not have notice of Thomas's claims as
required for waiver of immunity under the Tort Claims Act. See Tex. Civ. Prac. &
Rem. Code Ann. § 101.101 (Vernon 2005). Section 101.101, governing notice to a
governmental entity for Tort Claims Act purposes, provides, in relevant part:

 (a) A governmental unit is entitled to receive notice of a claim
against it under this chapter not later than six months after the day that
the incident giving rise to the claim occurred. The notice must
reasonably describe: 


 (1) the damage or injury claimed;


 (2) the time and place of the incident; and


 (3) the incident.


 . . . .


 (c) The notice requirements provided or ratified and approved by
Subsections (a) and (b) do not apply if the governmental unit has actual
notice that death has occurred, that the claimant has received some
injury, or that the claimant's property has been damaged. 


Id. If a party gives formal notice it must comply with the statutory requirements in
subsection 101.101(a); when it gives no formal notice it must satisfy the requirements
of actual notice, as provided by subsection 101.101(c). See id.

 The majority holds that TDCJ had neither actual notice of Thomas's claims, in
satisfaction of section 101.101(c), nor formal notice, in satisfaction of section
101.101(a). I would hold that it had both.

Actual Notice

 Hollimon died while being chemically restrained, forcibly removed from his
cell, and transported to the prison infirmary by correctional staff of the Estelle Unit
attended by a nurse employed by the prison to provide medical treatment to prisoners
in the unit. He was pronounced dead by Estelle Unit medical personnel. An autopsy
was performed on Hollimon's body and disclosed that the cause of death was
asphyxiation. Each of the TDCJ employees involved in the incident of chemically
and forcibly restraining Hollimon and in moving him to the infirmary where he was
pronounced dead was required to write a report about the incident. An investigation
was performed by TDCJ, and a criminal investigation into Hollimon's death was
launched by the Walker County District Attorney. 

 The majority reasons that, nevertheless, TDCJ did not have actual notice under
subsection 101.101(c) because it did not have "actual subjective awareness" of
Hollimon's claims, as required to satisfy section 101.101(c). The majority cites as
authority for its conclusion Texas Department of Criminal Justice v. Simons, 140
S.W.3d 338 (Tex. 2004), which, it states, settled the issue of what constitutes "actual
notice" under section 101.101(c). In my view, the majority opinion misconstrues the
actual notice requirements for satisfaction of subsection 101.101(c) set out in Simons.

 Simons defines "actual notice to a governmental unit" for purposes of section
101.101(c) as knowledge of (1) a death, injury, or property damage; (2) the
governmental unit's alleged fault producing or contributing to the death, injury, or
property damage; and (3) the identity of the parties involved." Simons, 140 S.W.3d
at 344. 

 The rationale for the supreme court's interpretation of the actual notice
requirement of section 101.101(c) in Simons is instructive. Simons was decided to
settle a dispute among the courts of appeals over how much evidence was required
to establish that a governmental unit sued under the Tort Claims Act had actual notice
of the claim. The dispute arose in the wake of Cathey v. Booth, 900 S.W.2d 339
(Tex. 1995) (per curiam). In Cathey, the Booths had sued a county hospital alleging
that the hospital's negligent diagnosis and treatment of the wife's obstetric condition
resulted in the stillborn birth of their child. Cathey, 900 S.W.2d at 340. They gave
no formal notice of their claim to the hospital under subsection 101.101(a); and they
argued that subsection (c) relieved them of any need to give any notice of their claim
to the hospital because the hospital had actual notice that injury and death had
occurred. Id. at 341. 

 The supreme court, in Cathey, rejected the Booths' argument that actual
knowledge that a patient has received treatment at a governmental hospital or has
died after receiving treatment is sufficient to constitute notice to the hospital that it
might be sued under the Tort Claims Act. Id. It observed that such an interpretation
of subsection 101.101(c) would be "the equivalent of having no notice requirement
at all because the hospital would be required to investigate the standard of care
provided to each and every patient that received treatment." Id. The court held that
a governmental unit is entitled to receive formal, written notice of a claim against it
within six months of the incident from which the claim arises unless it has actual
notice of the claim, including knowledge of its "alleged fault producing or
contributing to the death, injury, or property damage." Id.

 The language in Cathey led to confusion, however, over the proof required to
establish actual notice of a potential claim against a governmental unit under section
101.101(c). That was the issue addressed in Simons, and the supreme court's
resolution of the standard was clear:

 Actual notice may be imputed to a governmental unit when its
fault is obvious or an agent charged with a duty to investigate and report
to the unit receives notice of the three Cathey elements. (1) Thus, an
incident that triggers an investigation and accident report will impute
such notice where there is evidence to connect the accident to an action
or omission by the governmental unit such that it should have known of
its potential culpability. . . .

 . . . .


 Actual notice is imputed to a governmental entity if it, or one of
its agents, is aware of facts and circumstances surrounding an accident
sufficient to put them on inquiry that, if pursued, would reveal its
alleged or possible fault producing or contributing to the injury. 
Governmental entities have actual notice to the extent that a prudent
entity could ascertain its potential liability stemming from an incident,
either by conducting a further investigation or because of its obvious
role in contributing to the incident.


 . . . .


 What we intended in Cathey by the second requirement for actual
notice [the governmental unit's alleged fault] was that a governmental
unit have knowledge that amounts to the same notice to which it is
entitled by section 101.101(a).


Simon, 140 S.W.3d at 346-47 (emphasis added). 

 In my view, it cannot rationally be claimed that TDCJ did not have notice that
Hollimon's death had occurred and of its own involvement in that death when (1) his
death occurred in the Estelle Unit at the time TDCJ employees were chemically and
forcibly restraining him in his cell and transporting him to the prison infirmary; (2)
TDCJ ordered an autopsy performed on his body, which showed a broken neck and
death from asphyxiation; (3) all involved TDCJ personnel were required to write
reports on the death; (4) TDCJ conducted an investigation of the death; and (5) the
Walker County District Attorney, likewise, opened a criminal investigation into the
death.

 The facts and circumstances under which actual notice is imputed to a
governmental entity as a matter of law are fully realized in this case. Information
sufficient to impute actual notice of Thomas's claims to TDCJ arises not only from
TDCJ's "obvious role in contributing to" Hollimon's death, which occurred while he
was being chemically and physically subdued and transported and monitored by
TDCJ personnel, but also from the autopsy TDCJ ordered, the reports it solicited, the
internal investigation it performed, and the Walker County District Attorney's
criminal investigation into the circumstances of Hollimon's death. TDCJ thus had
ample evidence to connect Hollimon's death to acts and/or omissions by TDCJ
employees such that, if further pursued, a prudent entity could have ascertained its
potential liability stemming from the death. See Simon, 140 S.W.3d at 346. 

 Accordingly, I would hold that TDCJ had actual notice of Hollimon's death
and of circumstances attendant on that death that implicated TDCJ employees in
potentially actionable acts and omissions.

Formal Notice

 I would also hold that the June 12, 1998 letter constituted formal notice under
section 101.101(a), even though formal notice was not required under the
circumstances of this case due to TDCJ's actual notice of the facts giving rise to its
potential liability. See Tex. Civ. Prac. & Rem. Code Ann. § 101.101(c). 

 On June 12, 1998, four months after Hollimon's death, an attorney representing
appellees Linda Thomas, personal representative of Hollimon's estate, and
Hollimon's daughter Ashley wrote to the warden of the Estelle Unit as follows: 

 I write this letter on behalf of the surviving daughter, and the
personal representative of the Estate of Damon L. Hollimon. Ashley D.
Hollimon, a minor, is the sole surviving child of Damon L. Hollimon. 
Linda Thomas, Ashley's mother, is the personal representative of the
Estate of Damon L. Hollimon. Please see attached Affidavit of Personal
Representative, Affidavit of Heirship, and Death Certificate of Damon
L. Hollimon. 


 As evidenced by the Death Certificate, Mr. Hollimon died of
asphyxiation on February 18, 1998, while an inmate at the Estelle Unit
of the Texas Department of Corrections. 


 At this time, I request copies of medical records, investigative
reports, and video tapes relating in any way to the death and the
circumstances surrounding the death of Mr. Hollimon. If there is a
charge for these documents, please advise. 


On February 12, 1999, Thomas, as personal representative for the estate of Damon
Hollimon deceased, (2) sued TDCJ, its executive director, the warden of the Estelle
Unit, and unnamed prison guards, asserting causes of action under the Texas Tort
Claims Act, (3) Wrongful Death and Survival statutes, (4) and section 1983 (5) for violations
of civil rights. 

 Even though the majority acknowledges that the June 12, 1998 letter "refers to
Hollimon's death (the damage or injury) and gives the date of the death at the Estelle
Unit (the time and place)," it concludes that it does not constitute formal notice of
appellees' claims because "it does not describe the incident." Thus, the majority
reasons that TDCJ could read the letter and still not have "a subjective awareness that
its fault produced or contributed to the claimed injury." I disagree. 

 First, section 101.101(a) requires only that the notice "reasonably describe" the
damage or injury claimed, the time and place of the incident, and the incident itself
so that the governmental unit may identify the incident and its alleged involvement
in it. See Tex. Civ. Prac. & Rem. Code Ann. §101.101(a); Simons, 140 S.W.3d at
343. The incident referenced in the June 12, 1998 letter is Hollimon's death "by
asphyxiation on February 18, 1998 while an inmate at the Estelle Unit of the Texas
Department of Corrections." Under the circumstances of this case, it is inconceivable
that TDCJ did not know to which incident the letter was referencing or whether its
employees were allegedly involved when it received a letter from an attorney stating
that he represented Hollimon's estate and survivors. 

 Moreover, it is clear that the letter portends a potential claim by Hollimon's
estate and heirs against TDCJ based on the actions of its employees in contributing
to Hollimon's death on February 18, 1998. First, a statement that a specific claim is
going to be filed is not required for formal notice of a claim by section 101.101(a). 
Second, the June 12, 1998 letter was from appellees' attorney to the warden of the
Estelle Unit. The letter stated, "I request copies of medical records, investigative
reports, and video tapes relating in any way to the death and the circumstances
surrounding the death of Mr. Hollimon. If there is a charge for these documents,
please advise." Such a statement in a letter to the head of a governmental unit,
namely a prison, from an attorney who identifies himself as representing the survivors
and estate of an inmate who died while being chemically and forcibly subdued and
moved by prison employees could not have reasonably have been interpreted by the
general counsel to TDCJ, to whom the warden referred the letter, as anything other
than notice of impending litigation by Hollimon's estate and survivors that triggered
TDCJ's duty to retain documents relevant to the incident and the work product
exemption for investigations made in anticipation of litigation. See Tex. R. Civ. P.
192.3(a), (b), 192.5(a). Any other inference drawn by TDCJ's counsel would have
been below the standard of professional care of reasonably competent counsel. Thus,
in my opinion, the June 12, 1998 letter and the attached death certificate "reasonably
described" events sufficiently known to TDCJ to put it on notice of the damage or
injury claimed, the time and place of the incident, and the potential liability for claims
arising out of that incident.

 The majority opinion reintroduces all the confusion Cathey and Simon were
designed to lay to rest--and which, until now, they had indeed laid to rest. (6)
 I would
hold that actual notice of Hollimon's death and its potential liability can be imputed
to TDCJ as a matter of law, and I would overrule appellants' plea to the jurisdiction
based on lack of notice. I would, therefore, address the merits of the trial court's
denial of TDCJ's plea to the jurisdiction.

 Use of Tangible Property

 In two issues, TDCJ argues that appellees' claims against it under the Tort
Claims Act should be dismissed because its sovereign immunity was not waived by
section 101.021(2) of the Texas Civil Practice and Remedies Code (7) in that the injury
to Hollimon was not caused by the "use" of tangible property, i.e., the pepper spray
or wing picket gate, as alleged by appellees. Rather, TDCJ contends that appellees
failed to raise a fact issue on the required causal link between the condition or use of
property and the harm to Hollimon, which is required for waiver of immunity under
the Tort Claims Act and thus for subject matter jurisdiction; therefore, this Court
should dismiss appellees' claims against it for lack of subject matter jurisdiction.

 Section 101.021 of the Tort Claims Act provides, in relevant part: 

 A governmental unit in the state is liable for:


 (1) property damage . . . proximately caused by the wrongful act or
omission or the negligence of an employee acting within his
scope of employment if:


 . . . .


 (B) the employee would be personally liable to the claimant
according to Texas law. . . .



 personal injury and death so caused by a condition or use of tangible
personal or real property if the governmental unit would, were it a
private person, be liable to the claimant according to Texas law.



Tex. Civ. Prac. & Rem. Code Ann. § 101.021 (Vernon 2005). The term "'use'
means 'to put or bring into action or service; to employ for or apply to a given
purpose.'" Texas Natural Res. Conservation Comm'n v. White, 46 S.W.3d 864, 869
(Tex. 2001).

 Appellees pled that TDCJ's decision to spray Hollimon three times with O.C.
pepper spray caused him to cough and to have difficult time breathing and was thus
a proximate cause of his subsequent death by asphyxiation. They also pled that the
locked wing picket gate caused a delay of five minutes in getting Hollimon from his
cell to the infirmary, causing him to suffer irreversible brain injury from lack of
oxygen. Their pleadings are supported by the evidence.

 Hollimon was described by clinical personnel immediately before the forced
cell move as "out of it . . . his eyes were wild, he had food in his mouth that was
falling out, and was shouting obscenities . . . words could not reach him." Pierson
testified that Hollimon was coughing and having difficulty breathing with each
application of the pepper spray but continued verbalizing. The testimony about the
manner in which Hollimon was subdued and the timing is unrefuted. It is also
unrefuted that Hollimon received no oxygen or CPR from the time he was taken out
of his cell at 3:31 p.m. until he reached the infirmary at 3:38 p.m. He was pronounced
dead at 4:15 p.m. There was also unrefuted testimony that the trip from Hollimon's
cell to the infirmary would normally take one and one-half to two and one-half
minutes, but because the wing picket gate was locked and unattended, it was
necessary to find a guard to unlock the gate, causing a delay of approximately five
minutes. There was unrefuted testimony that irreversible brain death occurs in five
or six minutes.

 Dr. Sparks Vesey, the TDCJ pathologist who conducted the autopsy on
Hollimon, testified that the effects of pepper spray include irritation to the throat,
coughing, and shortness of breath. He further testified that a person develops
irreversible brain injury in about four and one-half to five minutes if he is not
breathing and is not getting oxygen and that Hollimon would have suffered
irreversible brain injury by the time the TDCJ personnel got him to the infirmary. He
also testified that the hyoid bone at the back of Hollimon's throat was broken, but that
a fracture of the hyoid bone "in and of itself, won't kill you."

 Pierson testified to Hollimon's coughing after each spraying. She also testified
that she did not give CPR to Hollimon even though she knew that his lack of vital
signs indicated a need for CPR. She also testified that a person who is not breathing
suffers irreversible brain death in six minutes. 

 Dr. Edward Gripon, appellees' expert, testified by affidavit that Hollimon's
inability to breath was a proximate cause of his death by asphyxiation. (8) He further
testified that the use of the chemical agent that caused Hollimon to cough repeatedly
would have been a proximate cause of his asphyxiation, which caused his ultimate
death. 

 For immunity to be waived by section 101.021(2) of the Civil Practice and
Remedies Code, personal injury or death must have been proximately caused by the
condition or use of tangible property. Dallas County Mental Health & Mental
Retardation v. Bossley, 968 S.W.2d 339, 343 (Tex. 1998); Bonham v. Texas Dep't of
Criminal Justice, 101 S.W.3d 153, 157-58 (Tex. App.--Austin 2003, no pet.). To
be a proximate cause of injury, the negligent conduct must involve some condition
or use of the tangible property. Bonham, 101 S.W.3d at 158. Waiver of immunity for
personal injury caused by the use of tangible personal or real property extends to all
injuries proximately caused by the use or misuse of the property, rather than just to
those injuries proximately caused by the property itself. See Texas Dep't of Mental
Health and Retardation v. Petty, 848 S.W.2d 680, 682-83 (Tex. 1993); see also
Michael v. Travis County Hous. Auth., 995 S.W.2d 909, 913 (Tex. App.--Austin
1999, no pet.). However, the condition or use of the property must not be too
attenuated from the injury to be said to have caused it. See Bossley, 968 S.W.2d at
343.

 Sovereign immunity is waived under section 101.021(2) when a governmental
unit "has provided property that lacks an integral safety component and the lack of
this integral component led to the plaintiff's injuries." Bossley, 968 S.W.3d at 343
(quoting Kerrville State Hosp. v. Clark, 923 S.W.2d 582, 585 (Tex. 1996)); Michael,
995 S.W.2d at 914-15 (immunity waived by housing authority responsible for
inspecting and maintaining fence where pit bulls escaped through holes in fence and
attacked passing children); see also Robinson v. Central Tex. MHMR Ctr., 780
S.W.2d 169 (Tex. 1989) (immunity waived by mental health facility that had failed
to provide life preserver for epileptic patient who died while swimming); Lowe v.
Texas Tech Univ., 540 S.W.2d 297 (Tex. 1976) (immunity waived by university that
failed to provide proper safety equipment for football player leading to knee injury);
Overton Mem'l Hosp. v. McGuire, 518 S.W.2d 528 (Tex. 1975) (per curiam)
(immunity for personal injuries suffered by patient who fell out of bed waived by
hospital that provided hospital bed without rails). Property does not cause injury,
however, "if it does no more than furnish the condition that makes injury possible."
Bossley, 968 S.W.2d at 343 (causation too attenuated and, therefore, immunity not
waived by mental health facility for death of patient who escaped through unlocked
doors, ran half a mile to freeway, and committed suicide by throwing himself in front
of truck).

 Here, appellees have pled that the repeated use of pepper spray by TDCJ
personnel on Hollimon, who had food in his mouth, causing him to cough and have
difficulty breathing as he was forcibly restrained and subdued by five masked guards,
was directly related to his ensuing death from asphyxiation, and they substantiated
their claims with summary judgment evidence of the interference of the pepper spray
with Hollimon's breathing. These allegations and evidence are sufficient to state a
claim that the use of the pepper spray was a proximate cause of Hollimon's death by
asphyxiation.

 Nor can it be said that the locked wing picket gate merely furnished the
condition for an unrelated or attenuated injury to Hollimon. Rather, the purpose of
the locked gate was clearly to prevent persons from leaving the area of the cells, and
the purpose of having a guard at the locked gate was clearly to permit passage in
emergency or other appropriate situations. The gate was, nevertheless, left locked
and unattended. It directly impeded Hollimon's being taken to the infirmary for CPR
during the critical time for resuscitation. All of the evidence related to TDCJ's plea
to the jurisdiction supports the inference that the delay of approximately five minutes
by TDCJ personnel in getting CPR to Hollimon in the infirmary directly caused the
impossibility of his resuscitation, because brain death was inevitable during that lapse
of time. I would hold, therefore, that the unattended locked gate between the prison
cells and the infirmary during the time Hollimon was being chemically and physically
restrained by TDCJ personnel for forcible transfer out of the unit constituted a
condition or use of tangible real property that delayed his receiving medically
necessary CPR for approximately five minutes and, therefore, proximately caused his
irreversible brain death.

 This case is distinguishable from Bossley, in which an unlocked door through
which a mental patient escaped was deemed by the supreme court to be too attenuated
a cause to be a proximate cause of the patient's suicide by throwing himself in front
of cars on a highway half a mile away. See 968 S.W.2d at 341, 343. Rather, it is
virtually identical to Michael, in which the Travis County Housing Authority was
found to have waived immunity for personal injuries suffered by the plaintiff children
when pit bulls escaped through holes in a fence that it maintained and attacked them. 
See 995 S.W.2d at 911-12. Here, TDCJ was responsible for the locked condition of
the winged picket gate, which directly caused the five minute delay in getting CPR
for Hollimon that made his brain death inevitable.

 I would overrule TDCJ's issues on causation.

Pierson's Appeal

 The majority also dismisses appellees' civil rights claims against Pierson in her
personal capacity under Title 42, section 1983 of the United States Code. Again, I
dissent.

 As the majority states, section 1983 creates a private right of action for civil
damages for violations of federal law by persons acting under color of state law. See
42 U.S.C. § 1983; Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 82, 104
S. Ct. 892, 896-97 (1984). However, the doctrine of qualified immunity shields an
official performing discretionary functions from liability under section 1983,
provided the official's conduct does not violate clearly established constitutional or
statutory rights of which a reasonable person would have been aware. Harlow v.
Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982); Thomas v. Collins, 860
S.W.2d 500, 503 (Tex. App.--Houston [1st Dist.] 1993, writ denied). 

 The treatment a prisoner receives in prison is subject to scrutiny under the
Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979
(1994). The Eighth Amendment imposes duties on prison officials to "ensure that
inmates receive adequate food, clothing, shelter, and medical care," and to "'take
reasonable measures to guarantee the safety of the inmates.'" Farmer, 511 U.S. at
832, 114 S. Ct. at 1976 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S. Ct.
3194, 3200 (1984)). "Being violently assaulted in prison is simply not 'part of the
penalty that criminal offenders pay for their offenses against society.'" Farmer, 511
U.S. at 834, 114 S. Ct. at 1977.

 Not every injury suffered by a prisoner translates, however, into liability for
prison officials responsible for the victim's safety. Id. Rather, a prison official
violates the Eighth Amendment only when two requirements are met. Id. First, for
a claim based on a failure to prevent harm, like that against Pierson, the plaintiff must
show that the inmate was incarcerated under conditions posing a substantial risk of
harm. Id. In addition, the plaintiff must show that the official's state of mind was one
of "'deliberate indifference' to inmate health or safety." Id.; see also Scott v. Britton,
16 S.W.3d 173, 181 (Tex. App.--Houston [1st Dist.] 2000, no pet.). "[A]cting or
failing to act with deliberate indifference to a substantial risk of serious harm to a
prisoner is the equivalent of recklessly disregarding that risk." Farmer, 511 U.S. at
835, 114 S. Ct. at 1978. "[A] prison official cannot be found liable under the Eight
Amendment for denying an inmate humane conditions of confinement unless the
official knows of and disregards an excessive risk to inmate health or safety; the
official must both be aware of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and he must also draw the inference." Id. at
837, 114 S. Ct. at 1979; see Scott, 16 S.W.3d at 181. Proof of deliberate indifference
thus requires a showing of subjective recklessness, i.e., a showing of conscious
disregard of a substantial risk of serious harm. See Farmer, 511 U.S. at 839, 114 S.
Ct. at 1980; Scott, 16 S.W.3d at 181. 

 Under United States Supreme Court authority, "Whether a prison official had
the requisite knowledge of a substantial risk is a question of fact subject to
demonstration in the usual ways, including inference from circumstantial evidence
. . . and a factfinder may conclude that a prison official knew of a substantial risk
from the very fact that the risk was obvious." Farmer, 511 U.S. at 842, 114 S. Ct. at
1981. It remains open to prison officials charged with deliberate indifference,
however, to show "that they did not know of the underlying facts indicating a
sufficiently substantial danger and that they were therefore unaware of a danger, or
that they knew the underlying facts but believed (albeit unsoundly) that the risk to
which the facts gave rise was insubstantial or nonexistent." Id. at 844, 114 S. Ct. at
1982.

 Pierson was a registered nurse employed by the University of Texas Medical
Branch Correctional Managed Care (UTMB/CMC). Her responsibilities included
providing medical treatment to inmates incarcerated in the Estelle Unit of TDCJ. On
February 18, 1998, she was assigned to approve the use of chemical restraint and to
monitor the safety of Hollimon's treatment during the chemical restraint and forced
transfer from his cell to the psychiatric section of the Estelle Unit. Prison policy
required that a nurse be present when chemical agents were used by correctional staff
and when they planned to conduct a forced cell move of a prisoner from his cell. The
purpose of this policy can only have been to ensure compliance with safety standards
required by the Eighth Amendment. 

 Pierson had been in the nursing program all of her professional life and had
been involved with emergency medical situations since 1991. She testified that she
was well trained in what to do in emergency medical situations. The duties she
performed in connection with Hollimon's forced transfer from his cell included
giving medical clearance for the use of chemical agent O.C. pepper spray, monitoring
the procedure, timing the spraying with her watch, and noting in her medical notes
the precise time of each spraying (3:22 p.m.; 3:24 p.m.; and 3:26 p.m.) and the effect
the chemical agent had on Hollimon each time. Pierson also observed, and duly
recorded, the five man team's entry into Hollimon's cell at 3:28p.m., immediately
after the repeated pepper spraying, and his being forcibly subdued and handcuffed,
carried outside the cell, and lain on the floor. She noted the time in her chart at
3:31p.m. 

 After noting the time Hollimon was removed from his cell, Pierson
immediately noted that his neck was limp and his head was "wobbly" and
uncontrolled. She took Hollimon's vital signs and found he had no carotid pulse, his
pupils were fixed and dilated 4-5m.m., he had no heartbeat, and he was not breathing. 
The mere fact that Pierson was assigned these duties necessarily evinces TDCJ's and
Pierson's acknowledgment that the use of chemical restraint and physical force on a
disoriented and psychotic prisoner presents "conditions posing a substantial risk of
serious harm." Farmer, 511 U.S. at 834, 114 S. Ct. at 1977. 

 Pierson admitted in her deposition that she knew that Hollimon's condition
when he was carried out of his cell with a "wobbly" neck and without vital signs
indicated a need for CPR, but she did not administer CPR because she was afraid to
remove her gas mask for fear of being incapacitated. Indeed, Pierson testified that her
check of Hollimon's vital signs told her Hollimon was not breathing and "that's an
indication for CPR." Nevertheless, her only action was to order the correctional staff
to take Hollimon to the infirmary.

 The only reasonable inference for Eighth Amendment and section 1983
purposes is that Pierson knew and consciously disregarded the very substantial risk
that if Hollimon were not given CPR immediately he could not be resuscitated. And,
again, Pierson herself admitted in an affidavit made an exhibit to her own motion for
summary judgment that "it was obvious to me that he was in serious distress - I fully
appreciated the nature of his condition. . . ." Moreover, even if Pierson initially
calculated that the medical team had time to get Hollimon to the infirmary before
CPR was performed, she was necessarily disabused of that notion when the wing
picket gate out of the unit was locked and a guard had to be found to unlock it. 
Pierson also testified that she knew that a patient becomes brain dead after six
minutes without breathing. 

 Given Pierson's training as a nurse, her extensive experience in emergency
medical situations, her observations of Hollimon's condition, the careful notes she
took about the precise timing and effect of each event during the chemical restraint
and physical subduing of Hollimon, and her explicit avowal that she appreciated the
nature of his condition and knew CPR was indicated and that brain death would occur
in six minutes, it is unreasonable to infer that Pierson had no subjective awareness of
facts from which the inference could be drawn that the failure to give Hollimon CPR
when he was removed from his cell posed a substantial risk of serious harm to
Hollimon and that the risk was augmenting with every moment of delay in getting
him to the infirmary. It is also unreasonable to infer that Pierson failed to draw the
inference that her failure to give CPR to Hollimon or to obtain CPR for him posed a
substantial risk of serious harm to him. See Farmer, 511 U.S. at 837, 114 S. Ct. at
1979. Yet Pierson consciously disregarded the risk to Hollimon's health and safety
and made no effort whatsoever to get him the treatment necessary to resuscitate him
by taking off her own gas mask to give him CPR, by working in tandem with the
moving team to save him, or by doing anything else that her extensive training and
experience in emergency medical situations would have alerted her to do. Indeed, she
still failed to give him CPR even after she judged it safe to remove her gas mask and
after she found the winged picket gate locked.

 It is difficult for me to imagine what else it would take to establish Pierson's
"deliberate indifference" to Hollimon's health or safety under the standard of proof
established by the Supreme Court in Farmer. See 511 U.S. at 834, 114 S. Ct. at 1977. 
Pierson is not in a position to argue that she "did not know of the underlying facts
indicating a sufficiently substantial danger and that [she was] therefore unaware of
a danger, or that [she] knew the underlying facts but believed (albeit unsoundly) that
the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844, 114
S. Ct. at 1982. Indeed, the record conclusively establishes the opposite. Therefore,
I would hold, as a matter of law, that Hollimon was restrained and transported to the
prison infirmary under conditions posing a substantial risk to his health and safety,
that Pierson appreciated the risk, and that her state of mind was one of deliberate
indifference under the applicable legal standard, as proved by the summary judgment
evidence in the case. See id. at 834, 114 S. Ct. at 1977. 

 The majority, however, weighs appellees' evidence of deliberate indifference,
namely, Pierson's failure to attempt CPR on Hollimon beside his cell or at the locked
wing picket gate, against the movant's, Pierson's, affidavit that she acted in good
faith and the opinion testimony from Pierson's colleague that Pierson's actions were
appropriate, and it holds that Pierson established her entitlement to summary
judgment on her affirmative defense of qualified immunity. The majority thus treats
the proof of deliberate indifference not as a matter to be determined in accordance
with the standard set out in Farmer but as a swearing match between the defendant's
(movant's) witnesses and the plaintiffs' (non-movant's), with the appellate court as
factual referee charged with determining whether appellees, as non-movants,
established deliberate indifference as a matter of law. This is the wrong standard of
proof of deliberate indifference, not only under section 1983 but also under Texas
summary judgment law. 

 A defendant is entitled to summary judgment on the affirmative defense of
qualified immunity if she conclusively establishes all elements of her affirmative
defense as a matter of law. Fowler v. Szostek, 905 S.W.2d 336, 340 (Tex.
App.--Houston [1st Dist.] 1995, no pet.). The nonmovant must then expressly
present to the trial court any reasons in avoidance of the movant's entitlement to
summary judgment, together with summary judgment proof when necessary to
establish a fact issue. Id. Summary judgment is reviewed de novo. Valence
Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). The reviewing court
takes as true all evidence favorable to the nonmovant; and it indulges every
reasonable inference and resolves any doubt in the nonmovant's favor. Id. 

 I would hold that Pierson failed to prove her affirmative defense of qualified
immunity because she did not prove as a matter of law that she was not deliberately
indifferent to the risk to Hollimon's health and safety. Indeed, under the standard of
proof of deliberate indifference set out in Farmer and adopted by this Court in Scott,
the summary judgment proofs establish the contrary, namely, Pierson's deliberate
indifference to Hollimon's health and safety.

Conclusion

 I would affirm the trial court's orders denying TDCJ's plea to the jurisdiction
and Pierson's motion for summary judgment.

 


 Evelyn V. Keyes

 Justice



Panel consists of Justices Nuchia, Keyes, and Hanks.


Justice Keyes, dissenting.
1. "(1) [A] death, injury, or property damage; (2) the governmental unit's alleged fault
producing or contributing to the death, injury, or property damage; and (3) the identity
of the parties involved." Simons, 140 S.W.3d at 344. 
2. During the pendency of this lawsuit, Ashley Dominique Hollimon reached her
majority and joined the suit in her individual capacity. 
3. See Tex. Civ. Prac. & Rem. Code Ann. §§ 101.001-109.007 (Vernon 2005).
4. See id. §§ 71.001-71.051 (Vernon 2005).
5. See 42 U.S.C. § 1983 (Civil Rights Act of 1964).
6. The majority relies on dictum from Simons stating that actual notice is not triggered
"merely by [an agency's] conducting an investigation, or even by obtaining
information that would reasonably suggest its culpability." Simons, 140 S.W.3d at
348 (emphasis added). This language was in response to TDCJ's argument in Simons
that if merely investigating an incident counted as notice it would have "a perverse
incentive to ignore every incident until receives formal notice of a claim." Id. It does
not in any sense undermine the applicability here of the supreme court's holding in
Simons that "[g]overnmental entities have actual notice to the extent that a prudent
entity could ascertain its potential liability stemming from an incident, either by
conducting a further investigation or because of its obvious role in contributing to the
incident." Id. at 346-47. 

7. Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2) (Vernon 2005).
8. Dr. Gripon is a physician board-certified by the American Board of Psychiatry
and Neurology in psychiatry and a diplomate of the American Board of
Psychiatry and Neurology with additional qualification in forensic psychiatry. 
He reviewed documentation, including medical records, reports, affidavits, and
deposition testimony.