In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-419 CV


____________________



TEXAS DEPARTMENT OF TRANSPORTATION, Appellant



V.



YOLANDA GUIDRY, as sole heir and representative of 


THE ESTATE OF TEMPIST BAZILE, DECEASED, and heir 


and next friend of THE ESTATE OF THE DECEASED, 


UNBORN CHILD OF TEMPIST BAZILE and MILTON LEWIS, Appellees






On Appeal from the 58th District Court


Jefferson County, Texas


Trial Cause No. A-176,183






MEMORANDUM OPINION


 At approximately 12:10 a.m. on December 7, 2003, an automobile collision at the
intersection of U.S. Highway 69 and FM 365 in Port Arthur, Texas, claimed the life of 
Tempist Bazile, as well as the life of her unborn child. Bazile, and her passenger, Milton
Lewis, were southbound on the service road of Highway 69 when their vehicle was struck
by a vehicle driven by Bernardo Morales, Jr., who was traveling west on FM 365. The
accident report prepared by personnel with the City of Port Arthur Police Department
indicated that Bazile failed to stop for a red light at the intersection, thus, precipitating the
collision. Bazile was pronounced dead at the scene, and Lewis was transported to a local
hospital for treatment. He ultimately survived the collision. 

 Bazile's mother, Yolanda Guidry, sued Texas Department of Transportation
("TxDOT"), Bernardo Morales, Jr., and Bernardo Morales, Sr., contending the defendants
were liable for the deaths of Bazile and Bazile's unborn child. (1) Lewis also filed suit against
the three previously named defendants as well as against Bazile's estate. TxDOT filed a plea
to the jurisdiction and motion for traditional and no-evidence summary judgment in both the
Guidry and Lewis suits. (2) The trial court orally granted the plea to the jurisdiction with regard
to Lewis' suit on the basis of his failure to provide pre-suit notice to TxDOT. See Tex. Civ.
Prac. & Rem. Code Ann. § 101.101 (Vernon 2005); Tex. Gov't Code Ann. § 311.034
(Vernon Supp. 2006). The trial court orally denied the plea to the jurisdiction as to Guidry's
claims. However, the only written order appearing in the record includes in the style all of
the individual plaintiffs and defendants, and merely states: "The Court, having considered
the State's Plea to the Jurisdiction, is of the opinion that the same should be, and here by [sic]
is, Denied." TxDOT perfected this interlocutory appeal from the denial of its plea to the
jurisdiction. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (Vernon Supp. 2006).

 Lewis has not filed a brief in response to TxDOT's appellate issue. TxDOT contends
it is "undisputed that Plaintiff Lewis failed to give notice[.]" Although TxDOT has not
provided an affidavit to that effect nor directed our attention to any such evidence in the
record, we do find that Lewis' trial counsel conceded the fact at the September 22, 2006,
hearing. When asked if he had anything to controvert the fact that Lewis had failed to give
notice of suit to TxDOT, Lewis' trial counsel replied, "I think [TxDOT] has imputed notice,
Your Honor[,] . . . [b]ecause [Lewis] was riding in the same car with the lady that got killed." 
When asked for authority for that proposition, counsel responded that he had not found any
at that time. 

 To satisfy the pre-suit notice requirement under section 101.101 of the Texas Tort
Claims Act, "actual notice" under subsection (c) requires a plaintiff provide the
governmental unit knowledge of the information to which it is entitled under subsection (a)
and a subjective awareness that its fault produced or contributed to the claimed injury. See
Tex. Dep't of Criminal Justice v. Simons, 140 S.W.3d 338, 348 (Tex. 2004); see also Tex.
Civ. Prac. & Rem. Code Ann. §101.101. The Texas Legislature has made such notice a
jurisdictional prerequisite "in all suits against a governmental entity." See Tex. Gov't Code
Ann. § 311.034. We have recently found this provision to be procedural rather than
substantive and therefore, retroactive. See Texas Dep't of Criminal Justice v. Simons, 197
S.W.3d 904, 906-07 (Tex. App.--Beaumont 2006, no pet.). Having failed to provide TxDOT
notice as contemplated under section 101.101, Lewis was jurisdictionally precluded from
filing suit against TxDOT. The trial court erred in failing to grant TxDOT's plea to the
jurisdiction as to Lewis' claims against TxDOT. TxDOT's issue is sustained as to appellee
Milton Lewis. 

 We now turn to TxDOT's issue with regard to the claims against it made by appellee
Yolanda Guidry. An interlocutory appeal is available when a trial court denies a
governmental unit's challenge to subject matter jurisdiction, irrespective of the underlying
procedural vehicle used in obtaining the ruling. Thomas v. Long, 207 S.W.3d 334, 339 (Tex.
2006). Undisputedly, TxDOT is a "governmental unit" as defined in the Texas Tort Claims
Act. See Tex. Civ. Prac. & Rem. Code Ann. § 101.001(3) (Vernon 2005). In her original
petition, Guidry alleges that the intersection where the collision occurred was "unsafe,
unreasonably dangerous and not properly maintained" by TxDOT who "had knowledge of
this dangerous condition and failed to use ordinary care to protect [Bazile] from this
unreasonable risk of harm." Guidry's petition does not specify how or in what way the
intersection in question was "unreasonably dangerous." 

 In her appellate brief, Guidry contends that at the hearing on the plea to the
jurisdiction, conducted on September 22, 2006, TxDOT argued the "merits of Guidry's cause
of action rather than just disput[ing] jurisdictional facts." (3) The consequences of this tactic,
Guidry further contends, are fatal to TxDOT because on appeal of a grant or denial of a plea
to the jurisdiction the reviewing court "is precluded from considering the merits of the case." 
Additionally, Guidry argues our review of TxDOT's sovereign immunity claim is strictly
limited to sections 101.025 and 101.021(2) of the Tort Claims Act because TxDOT neither
verbally raised any other section during the September 22, 2006, hearing, nor cited to any
other provision in its original appellate brief. As the following will demonstrate, Guidry's
assertions are misplaced. 

 "Sovereign immunity protects the State from lawsuits for money damages." Tex.
Natural Res. Conservation Comm'n v. IT-Davy, 74 S.W.3d 849, 853 (Tex. 2002). TxDOT,
a governmental unit, is immune from both suit and liability unless its immunity is waived by
the provisions of the Tort Claims Act. See Tex. Civ. Prac. & Rem. Code Ann. §§ 101.021,
101.025 (Vernon 2005); Tex. Dep't of Transp. v. Garza, 70 S.W.3d 802, 806 (Tex. 2002). 
Sovereign immunity from suit deprives a trial court of subject matter jurisdiction and is,
therefore, properly asserted in a plea to the jurisdiction. See Tex. Dep't of Parks & Wildlife
v. Miranda, 133 S.W.3d 217, 224-26 (Tex. 2004). In a suit against a governmental unit, the
plaintiff must affirmatively demonstrate the trial court's jurisdiction by alleging a valid
waiver of immunity. See Dallas Area Rapid Transit v. Whitley, 104 S.W.3d 540-42 (Tex.
2003); Tex. Dep't of Criminal Justice v. Miller, 51 S.W.3d 583, 587 (Tex. 2001). "[I]f a plea
to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant
evidence submitted by the parties when necessary to resolve the jurisdictional issues raised." 
Miranda, 133 S.W.3d at 227. 

 Section 101.021 of the Tort Claims Act provides a limited waiver of sovereign
immunity. See Miller, 51 S.W.3d at 587. Section 101.021 has been interpreted to waive
sovereign immunity in three general areas: 1) injury caused by an employee's use of a
motor-driven vehicle, 2) premises defects, and 3) injuries arising out of conditions, or an
employee's use, of tangible personal or real property. Tex. Dep't of Transp. v. Able, 35
S.W.3d 608, 611 (Tex. 2000) (quoting Lowe v. Texas Tech Univ., 540 S.W.2d 297, 298 (Tex.
1976)); see also Dallas County Mental Health & Mental Retardation v. Bossley, 968 S.W.2d
339, 343 (Tex. 1998) ("Property does not cause injury if it does no more than furnish the
condition that makes the injury possible."). Guidry's petition attempts to demonstrate waiver
of immunity under section 101.021(2) of the Tort Claims Act by alleging a premises defect
claim. See Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2) (Vernon 2005); Able, 35
S.W.3d at 612.

 Generally, the Tort Claims Act waives immunity for personal injuries and deaths
proximately caused by a condition or use of personal or real property if a governmental unit
would, were it a private person, be liable. See Tex. Civ. Prac. & Rem. Code Ann. §
101.021(2). The condition/use-of-property waiver is an exception to the general rule that the
State cannot be held liable for its own negligence. See City of Grapevine v. Sipes, 195
S.W.3d 689, 692 (Tex. 2006). One of the listed exceptions to the Tort Claims Act's limited
waiver of immunity relates to claims arising from "the absence, condition, or malfunction of
a traffic or road sign, signal, or warning device unless the absence, condition, or malfunction
is not corrected by the responsible governmental unit within a reasonable time after notice[.]" 
See Tex. Civ. Prac. & Rem. Code Ann. § 101.060(a)(2) (Vernon 2005). 

 In its plea to the jurisdiction, TxDOT challenges the existence of jurisdictional
evidence of any malfunction or defective condition of the traffic light controlling the
intersection in question at the time of the collision, as well as the existence of jurisdictional
evidence establishing TxDOT's knowledge of any purported malfunction or defective
condition of the traffic light prior to, or at the time of, the collision. Filed along with the plea
to the jurisdiction was an affidavit from Bill Graves, the supervisor of the traffic signal shop
for TxDOT's Beaumont District ("signal shop"), and custodian of all of the records kept by
the signal shop. These records include maintenance records on all traffic signals for which
the signal shop is responsible, the signal shop's daily activity reports, a complaint log listing
circumstances which the signal shop is informed of possible problems with traffic signals,
certification test reports, and signal maintenance log entries. The signal shop's responsibility
includes maintenance of the traffic light located at the intersection in question. The essence
of Graves' affidavit, supported by pertinent TxDOT maintenance records, is that, at the time
of the collision, the traffic light was operating properly. Graves reached this conclusion from
the fact that he could find no signal shop record suggesting "conflicting green signals" ever
existed at the intersection in question, and from the fact that the signal's one repair,
completed on August 14, 2003, "dealt with a condition wherein the subject intersection signal
lights all, automatically, went to flashing red." He further indicates that after the signal's
repair on August 14, 2003, "through the month of December, 2003," he could find no record
or report to indicate any malfunction of the traffic light in question. 

 Graves' affidavit also established that the traffic light in question was equipped with
a "conflict monitor," the purpose of which is to cause the traffic light to immediately switch
to flashing red lights in all directions if some sort of malfunction or "conflict" occurs. He
also stated that when a "conflict" occurs and a traffic light switches to flashing red lights on
all sides, it continues functioning in that manner until it is repaired manually, as traffic lights
do not have the capacity for remote correction. As Graves could find no signal shop record
or report documenting a malfunction of the traffic light in question at or near the time of the
collision, Graves concluded "[i]t would be highly speculative to suppose that any such an
inexplicable, [undocumented, self-curing, conflict] event occurred." In sum, TxDOT's
jurisdictional evidence established that since August 15, 2003, the traffic light had functioned
properly and was functioning properly at the time of the collision. It also established that any
purported malfunction of the traffic light at the relevant time in question shown by some
other source was completely unknown to TxDOT. 

 Thereafter, Guidry filed a supplemental response to TxDOT's plea to the jurisdiction
and summary judgment motions. This supplemental response contains a report from
Guidry's expert, James W. Gartrell, Jr., a consulting engineer. In the course of formulating
his opinion, Gartrell examined a number of sources, including accident reports, depositions,
traffic signal sequencing, site measurements, TxDOT maintenance records, and the
deposition of Bill Graves taken on September 14, 2006. The pertinent portions of Gartrell's
opinion appear in the record as follows: 

 THE DEPOSITION OF MR. BILL GRAVES, ON [SEPTEMBER] 14, 2006,
PROVED THESE DOCUMENTS TO BE INACCURATE, INCLUDING
THE MAINTENANCE RECORDS TO BE INACCURATE.


 PRELIMINARY FINDINGS:

 

 . . . .


 Based on the above and the accident reports and verbal information from area
wrecker drivers, the intersection is hazardous and (TXDOT) knew or should
have known that the initial design / sequency [sic] of the traffic signal and / or
the revised sequencing of the traffic signal was a hazardous condition. The
signal was installed in the 1970's and TXDOT assumed the operation of
maintenance in 1988.

 

 . . . .

 

 TXDOT provided inaccurate traffic signal sequence and sign and maintenance
information, as revealed by Mr. Bill Graves, on September 14, 2006, at his
deposition.

 

 Providing this inaccurate information, in such a late time, will require
additional assessment time and a complete re-evaluation of engineering
assessments. At this time the revised TXDOT data seems to indicate
inaccurate maintenance records and a failed inventory control system of the
signal monitoring system and a traffic signal system. 

 

 TXDOT is the sole source for the traffic signal sequence and signal
maintenance information. Failure to provide accurate information either
prepared for this matter or providing records incorrectly have caused me to
doubt the credibility of the TXDOT source of information possibly indicating
no records were in existence, as required, and the records submitted by
TXDOT [were] prepared for this matter and not based on field conditions, as
was requested by TXDOT.

 

 The traffic signals are out of alignment with the driving lanes, in conflict with
applicable specifications. This could have been caused by inaccurate TXDOT
signal head replacement, which provided a hazardous condition to vehicles
traveling Southbound on U.S. 69 access road, by causing a delayed reaction
time to drivers.


 Guidry's response material, apparently filed on September 15, 2006, also includes
deposition excerpts of Bill Graves recorded on September 14, 2006, and mentioned by
Gartrell as the source of TxDOT's purportedly inaccurate maintenance records. In this
deposition, Graves stated that TxDOT determined the traffic light in question had been
working properly at the time of the collision, a fact confirmed by subsequent inspection of
the light done on December 29, 2003. Graves's deposition included the following exchange: 
 Q. [Guidry's counsel] Okay, sir. On page 4, the fifth paragraph down: 
Indications are the conflict monitor was properly working. The signals did not
switch to all flashing red and no service technician was called for after the
subject accident. Thus, it is evident that no conflict occurred. That is, had the
signal switched to all flashing red, it would not have switched back to normal
operation by itself without service by a technician.


 But you weren't at the accident site immediately after it happened. 
That's correct, isn't it?


 A. [Bill Graves] That is correct.


 Q. So, there'd be no way for you to know if it had gone to flashing red at that
time, correct?


 A. It was not reported to me that it was on red flash.


 Q. The last paragraph on page 4: A TXDOT employee who saw a conflict
would report it. When signals or signs are down or malfunctioning, there are
so many drivers, citizens, and law enforcement officers with cell phones and
radios that problems with signs are routinely, typically, promptly reported. 
Upon such a report, a service technician would be dispatched. There would
be a record of such a dispatch. Because there is no such record at or near the
time of the accident in question, it is evident that no malfunction was reported
and none occurred. 


 But you can't know if any malfunction occurred at the time, can you?


 A. I believe there not to have been a malfunction.


 . . . .


 Q. And, in fact, you say on page 6 -- sorry page 5 of your affidavit that in
referring to whether or not there was a conflict in the green signals it would be
highly speculative to suppose that any such inexplicable event occurred; is that
right?


 A. That's correct.


 Q. But it's speculation, isn't it, whether or not it occurred if you weren't there.


 . . . .


 Q. Correct?


 A. I -- I believe the equipment is pretty stable; and if it messes up, it stays
messed up until it is repaired. It's not self-healing. I don't think that
there was any malfunction or conflict that did occur, you know, because
it was not reported to me that there was a problem.


 The portion of Graves' deposition with which Gartrell apparently took issue appears
during the following exchange: 

 Q. [Guidry's counsel] [TxDOT's attorney] asked you some questions about
the -- about these conflict monitors, sometimes referred to in your log as safety
monitors, and the issue of -- of what monitor was present at the intersection in
December of 2003. Each time a safety monitor or conflict monitor is changed
it's recorded in this log; is that correct?


 A. [Bill Graves] It is supposed to be.


 Q. And, therefore, if it was changed, it would be reflected here; is that right?


 A. It should be.


 Q. And on this particular -- in the time frame from June of '03 to September
of '04 there's an indication that monitor No. 9512-579 was installed on June -
- I guess June 2nd of '03, is that right, or -- or is that date wrong?


 A. June 2nd of '03, you're asking which monitor was installed?


 Q. Yes, sir, at least - 


 A. 9512-579 was installed on June the 2nd.


 Q. Okay. According to these notes -- and then there's not another indication
in this log about any -- another conflict monitor being installed between June
of '03 and September of '04; is that correct?


 A. That is correct.


 Q. And, yet, there is a different safety monitor number that's indicated that's
replaced in September of '04 - 


 A. That is correct.


 Q. -- than the one that was installed in June of '03; and, so, there is no way
based on these records to be certain if the same safety monitor -- if any of these
monitors were hanging at that intersection -- or at that intersection -- excuse
me -- not hanging -- installed at that intersection on December 7, 2003.


 . . . .


 Q. Is that correct?


 A. It was either one of the two. I can't - - 


 . . . .


 A. -- say for sure.


 Q. There's no way for you to know that based on these records. 


 . . . .


 Q. Is that accurate?


 A. It was one of these two. 


 Q. Well - 


 A. The records indicate 9512-579 was installed in June. The records
indicate monitor 9606-793 was removed on 9/04. I cannot tell you at what
date safety monitor 9512-579 was removed; but when it was removed, it
was replaced with safety monitor 9606-793.


 Q. Well, there's no way for you to know that, though, is there, from this
record because there's no record of it being installed, is there?


 A. I don't know.


 Q. But there's not any in this record.


 A. There's no indication that that was installed in this record.


 Thereafter, TxDOT supplemented its plea to the jurisdiction, attaching an affidavit
from Bill Graves made subsequent to Gartrell's preliminary report, along with supporting
TxDOT maintenance records. Titled "Summary Disposition Affidavit Regarding History of
Signal Light Maintenance," Graves' affidavit includes the following pertinent portions:

 On April 10th, 2003, the TxDOT Signal Shop received word from the City of
Port Arthur that it had received a call or complaint that all the lights were
turning green at the same time on FM 365 at US 69. According to time
records (attached), TxDOT Signal Technician Steve Jones was dispatched to
the intersection. He arrived about 10:29 AM, observed the operation of the
signal, appears to have found no problem, and changed the safety Monitor. 
(See attached records.) 


 . . . .


 No objective test shows any pertinently (sic) defective Monitor. Regardless,
in an abundance of caution, Steve Jones made a Monitor replacement on April
10, 2003. 

 

 . . . .

 

 That is, the Monitor that was installed on 4/10/03 was SM # 9503-312. It was
subsequently tested on 6/2/03, and passed all tests. See attached test report.

 

 And, the Monitor that was installed on 6/2/03 was SM # 9512-579. It was
subsequently tested on 10/29/04, and passed all tests. See attached test report.


 And, Monitor SN 9606-793, which appears to have been incorrectly denoted
as installed on 9/20/04, also was subsequently tested, on 9/27/04, and passed
all tests. See attached test report.


 Thus, nothing indicates that any defect was found in any test for any Monitor
that was installed at any pertinent place and time. 


 Rather, the only documentation of a possible green conflict is based on hearsay
reported to the City of Port Arthur, to "Christine," who relayed such hearsay
to TxDOT, after which TxDOT sent Steve Jones to the intersection to perform
the work as stated above. 


 No report of a green conflict is shown to have been corroborated at any time
by any independent investigator or by any objective test. 


 As noted above, Guidry's petition may be construed as alleging a waiver of immunity
by way of premises defect under section 101.021(2) of the Tort Claims Act. The report
submitted by her expert, James Gartrell, focused the "dangerous condition" of the
intersection, as pleaded by Guidry, on a purported malfunction or defective condition or
placement of the traffic light at the time of the collision. Under this theory of liability,
section 101.060(a)(2) of the Tort Claims Act becomes applicable, and retains TxDOT's
immunity from suit unless negated by Guidry's jurisdictional evidence. See Tex. Civ. Prac.
& Rem. Code Ann. § 101.060(a)(2); Miranda, 133 S.W.3d at 228. The provisions of section
101.060 do not create a cause of action separate and apart from a premises defect cause of
action, but act as a further limitation on a governmental unit's waiver of immunity in
situations involving a "condition" or malfunction of a traffic control device. See In re Tex.
Dep't of Transp., 50 Tex. Sup. Ct. J. 546, 2007 WL 704584, at *4 (Tex. Mar. 9, 2007) (per
curiam) (orig. proceeding). 

 We have carefully examined all of the jurisdictional evidence submitted by both
parties and find nothing to indicate any malfunction or other defective condition or placement
of the traffic light at the time of the collision on December 7, 2003. Gartrell's report consists
of speculation and conjecture regarding the condition of the intersection in question, and he
essentially admits as much when he states that TxDOT's purportedly inaccurate information
"will require additional assessment time and a complete re-evaluation of engineering
assessments. . . . I will need additional time to review assessment of the hazardous
conditions of the intersection to Southbound U.S. 69 access road." As such, his statement
that "the intersection is hazardous and (TXDOT) knew or should have known that the initial
design / [sequencing] of the traffic signal . . . was a hazardous condition" is conclusory and
therefore, fails to raise a material fact with regard to TxDOT's retention of immunity under
section 101.060(a)(2). (4) 

 The record before us indicates that Guidry has failed in her burden to bring forward
sufficient jurisdictional evidence to create a fact question regarding the trial court's subject
matter jurisdiction in the face of TxDOT's jurisdictional evidence filed in support of its plea
to the jurisdiction. See Miranda, 133 S.W.3d at 227-28. TxDOT established the traffic light
was working properly at the time of the collision on December 7, 2003, and further
established a complete lack of any records or reports that the traffic light had malfunctioned,
or otherwise constituted a "dangerous condition," at or near the time of the collision so as to
place TxDOT on notice and triggering its duty to make repairs. No other material
jurisdictional evidence of a dangerous condition with regard to the intersection in question
was provided by Guidry. 

 As the jurisdictional evidence establishes TxDOT's immunity from liability was
retained under section 101.060(a)(2), its immunity from suit was also retained. See Tex. Civ.
Prac. & Rem. Code Ann. § 101.025(a) (Vernon 2005). We have already sustained
TxDOT's issue as to appellee-Milton Lewis as Lewis was jurisdictionally precluded from
filing suit against TxDOT for failing to provide proper notice as required under section
101.101. We sustain TxDOT's appellate issue with regard to Guidry's claims against it for
reasons discussed above. As the trial court lacks subject matter jurisdiction over TxDOT,
we reverse the order denying TxDOT's plea to the jurisdiction and render judgment
dismissing both Lewis' and Guidry's causes of action against TxDOT. 

 REVERSED AND RENDERED.


 __________________________________

 CHARLES KREGER

 Justice


Submitted on April 12, 2007

Opinion Delivered May 24, 2007



Before Gaultney, Kreger and Horton, JJ.
1. Guidry sued as sole heir and representative of the estate of Bazile and as heir and
next friend of the estate of the deceased's unborn child. 
2. Additional suits were brought by the liability carriers of the individual parties. 
All suits were ultimately consolidated by the trial court under one cause number, "A-176,183." 
3. Guidry cites Brazos Transit Dist. v. Lozano, 72 S.W.3d 442, 445 (Tex. App.--Beaumont 2002, no pet.) as support for this proposition. However, Lozano has been
explicitly disapproved with regard to this proposition in Thomas v. Long, 207 S.W.3d
334, 339 (Tex. 2006). 
4. At the September 22, 2006, hearing on TxDOT's plea to the jurisdiction, Guidry
was given the opportunity to present additional jurisdictional evidence to the trial court,
but explicitly declined.